Filed 10/24/16

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| ALKI PARTNERS, LP, et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> DB FUND SERVICES, LLC, et al., <br><br> Defendants and Respondents. | D068063 <br><br><br> (Super. Ct. No. 37-2011-00056561-CU-BC-NC) |

APPEAL from a judgment of the Superior Court of San Diego County, Timothy M. Casserly, Judge. Affirmed in part and reversed in part with directions.

James A. Shalvoy for Plaintiffs and Appellants.

Pillsbury Winthrop Shaw Pittman, Richard M. Segal, Nathaniel R. Smith, Kirke M. Hasson and G. Allen Brandt for Defendants and Respondents.

After allegedly losing millions of dollars in a hedge fund, investors sued the fund's administrator for breach of contract, alleging the administrator failed to (1) value the hedge fund's assets, (2) advise investors of the hedge fund's net asset value, and (3) respond to investor inquiries about the fund. The superior court granted summary judgment in favor of the fund administrator, determining the undisputed material facts

established no breach of contract. Later, the court awarded the fund administrator $3,027,237.96 in attorney fees based upon a contractual provision entitled "Standard of Care," which provides the administrator is to be indemnified for losses, including reasonable attorney fees "resulting in any way from the performance or non-performance of Administrator's duties hereunder . . . ."

The investors appeal, asserting triable issues of material fact preclude summary judgment. They also contend the court erroneously awarded attorney fees. We affirm summary judgment, determining the undisputed material facts establish the administrator did not breach the applicable contract. However, we reverse the award of attorney fees because the contractual language relied upon is a third party indemnity provision that does not create a right to prevailing party attorney fees in litigation between the parties to the contract. (See *Carr Business Enterprises, Inc. v. City of Chowchilla* (2008) 166 Cal.App.4th 14, 22-23 (*Carr*).)

FACTUAL AND PROCEDURAL BACKGROUND

A. *Introduction—The Parties*

This appeal involves several distinct entities having similar names. The investment fund entities are Alki Partners, LP; Alki Capital Partners, L.P.; Alki Fund, Ltd.; and Alki Capital Management, LLC. The fund administrators are DB Hedgeworks, LLC, and Hedgeworks Fund Services Limited.

Adding to the potential for confusion, these entities are parties to distinct contracts, one called a "Fund Administration Agreement" and the other an

2

"Administrative Services Agreement."  The record contains three such contracts, but they differ from each other in material respects.  One of them is not even signed.

Thus, to say "Hedgeworks" or "Respondents" breached "contracts" with "Alki"— as plaintiffs often assert in their briefs, is confusing at best, and potentially misleading.

To clarify, the following persons or entities are involved in this appeal:

1.  *Alki Partners, LP*

Alki Partners, LP (also known as Alki Capital Partners, L.P.) is a limited partnership in the business of operating a hedge fund.[1]  Hereafter, we refer to Alki Partners, LP, and Alki Capital Partners, L.P., as Alki Partners.

2.  *Alki Capital Management, LLC*

Alki Capital Management, LLC (Alki Capital) was the general partner of Alki Partners until approximately September 2008.

3.  *Scott Wilfong*

Scott Wilfong is the president of Alki Capital.  Wilfong was also the portfolio manager for Alki Partners.  Wilfong had sole authority to make investment decisions for Alki Capital and Alki Partners.

---

[1]     The term "hedge fund" is commonly used "as a catch-all for 'any pooled investment vehicle that is privately organized, administered by professional investment managers, and not widely available to the public.'"  (*Goldstein v. SEC* (D.C. Cir. 2006) 451 F.3d 873, 875.)  Hedge funds are "'usually structured as limited partnerships to achieve maximum separation between ownership and management . . . .'"  (*United States v. Lay* (6th Cir. 2010) 612 F.3d 440, 447.)

4. *DB Fund Services, LLC*, formerly known as *DB Hedgeworks, LLC*

DB Fund Services, LLC, formerly known as DB Hedgeworks, LLC (Hedgeworks), is a company that provided administrative services to Alki Partners under a contract entitled "Fund Administration Agreement" dated January 1, 2002.

5. *Bullfrog Research, LLC*

Bullfrog Research, LLC (Bullfrog) became the general partner of Alki Partners in September 2008. Bullfrog is also the assignee of certain claims and causes of action of individuals who are limited partners of Alki Partners.

6. *Alki Fund, Ltd.*

Alki Fund, Ltd. (Alki Fund) is a Cayman Islands company, an "offshore hedge fund."

7. *Hedgeworks Fund Services Limited*

Hedgeworks Fund Services Limited (HFSL) is a Cayman Islands limited liability company. HFSL provided administrative services to Alki Fund under a contract entitled "Administrative Services Agreement" dated August 1, 2005.

B. *Summary Judgment and Summary Adjudication Rulings*

In May 2014 the court issued the summary judgment ruling that is the basis for the instant appeal. However, in March 2014 the court made several rulings on a separate motion for summary judgment and summary adjudication. As a result of those March 2014 rulings, which are not challenged here, some of the entities and contracts noted *ante* are no longer involved in this case.

4

For example, in the March 2014 ruling, the court granted summary judgment in favor of HFSL on the grounds it was dissolved before plaintiffs' action was commenced. Thus, HFSL is out of the case.

The court also granted summary adjudication in favor of Hedgeworks against Alki Fund on the grounds no contract existed between them. As a result, the court dismissed claims alleged by Alki Fund. Alki Fund is out of the case.

There are other important results of these March 2014 rulings. The administrative services agreement dated August 1, 2005, between Alki Fund and HFSL is not relevant in this appeal. That August 1, 2005 contract does not determine Hedgeworks's contractual obligations to Alki Partners because the court has already adjudicated that Hedgeworks is not a party to that contract, and that ruling is not challenged on appeal.

The *only* contract that is relevant here is the fund administration agreement dated January 1, 2002, between Alki Partners and Hedgeworks. In their response to Hedgeworks's separate statement of undisputed material facts, plaintiffs concede this point, agreeing it is "undisputed" that the agreement is the contract for administrative services between Hedgeworks and Alki Partners.[2]

With these preliminary matters clarified, the relevant facts are summarized below.

---

[2]     Plaintiffs' briefs create considerable confusion by frequently quoting and relying on terms of the inapplicable Alki Fund-HFSL contract. As noted *ante*, the court's March 2014 summary judgment and summary adjudication rulings established that HFSL (which was a party to that contract) is out of the case because it was dissolved before plaintiffs filed suit, and Hedgeworks (which is in the case) was not a party to that contract.

D. *The Alki Partners Hedge Fund*

Alki Partners was created to acquire, invest in, and sell or otherwise trade in securities, defined broadly to include "investment instruments and vehicles of every kind and nature, foreign or domestic, whether publicly or nonpublicly traded . . . ."

Alki Capital, the general partner of Alki Partners, was given vast authority in running Alki Partners.  For example, the limited partnership agreement gives Alki Capital exclusive authority to determine the value of the partnership's assets:

> "10.6  Valuation.  The value of the assets and liabilities of the
> Partnership shall be determined by the [g]eneral [p]artner in good
> faith and such determination shall be conclusive and binding on all
> of the [p]artners . . . ."

The limited partnership agreement also gives Alki Capital "full, exclusive and complete authority in the management and control of the business of the [p]artnership  . . . and [it] shall make all decisions affecting the [p]artnership."

From 2002 to September 2008, Wilfong, as owner of Alki Capital, had the sole authority to make investment decisions for Alki Partners.

Only wealthy and sophisticated investors were eligible to become limited partners in Alki Partners.  The minimum investment was $250,000.  The offering was available only to investors having a net worth in excess of $1.5 million.  Before being accepted into the limited partnership, an investor had to demonstrate that he or she was an "accredited investor," sophisticated in financial and business matters generally and in investing in securities.

6

The Alki Partners' offering circular warned potential investors in all upper case letters, "THESE SECURITIES ARE SUBJECT TO A HIGH DEGREE OF RISK." Elsewhere, the circular explained that the general partner "has broad discretion to employ any [s]ecurities trading or investment techniques" many of which "are high-risk activities that could result in substantial losses under certain circumstances." After providing biographical information about Wilfong, the offering circular states, "The [p]artnership's performance depends, to a great extent, on the ability and experience of Mr. Wilfong in making investment decisions."

G. *The Hedgeworks Fund Administration Agreement*

Alki Partners entered into a contract with Hedgeworks entitled "Fund Administration Agreement," dated January 1, 2002 (the Agreement). The Agreement refers to Alki Partners as "Client" and to Hedgeworks as "Administrator." The Agreement provides that "No provision of this Agreement may be amended, modified, waived or discharged except as agreed to in writing by the parties."

Under the Agreement, Hedgeworks agreed to perform certain accounting and administrative functions for Alki Partners. In the ordinary course of business, each month Alki Partners (or its prime broker) would provide Hedgeworks with values for the fund's assets.[3] If the value of a particular asset was not available on the securities exchange or market, or if Alki Partners believed the reported value was not indicative of

---

[3]     A prime broker executes trades for a hedge fund.

fair value, Alki Partners had the right under the Agreement to provide Hedgeworks its own valuation. Schedule A, paragraph 2(d) of the Agreement provides in part:

> "The value of assets will be recorded at their fair value as determined in good faith by the Client in the absence of current quotations or if Client[] concludes that such quotations are not indicative of fair value by reason of illiquidity of a particular security or other factors."

Consistent with this provision, Wilfong testified in deposition, "I'm the one that valued it. Hedgeworks had nothing to do with the valuation."

In turn, Hedgeworks would take the asset values provided by Alki Partners, factor in monthly expenses and any other adjustments, and calculate the net asset value (NAV) of the fund. Under schedule A.2. of the Agreement, Hedgeworks was required to prepare limited partner statements on a monthly basis. Based on the fund's NAV, Hedgeworks would calculate individual investor balances and prepare monthly statements of account that it would send to each limited partner investor.

Hedgeworks issued the last such statements in mid-February 2008 for the month ending January 31, 2008. It is undisputed that these statements were accurate. The witness plaintiffs designated as the person most knowledgeable about their claims could not identify any situation where Hedgeworks failed to provide information Alki Partners requested or did something prohibited by the Agreement. Wilfong testified the statements Hedgeworks sent to investors were "100 percent" accurate.

H. *The Vatas Trades, Collapse, and Settlement*

RemoteMDX, Inc. (RMDX) sells tracking devices to monitor individuals in the criminal justice system. (See *Alki Partners, L.P. v. Vatas Holding GmbH* (S.D.N.Y.

8

2011) 769 F.Supp.2d 478, 485.)  In 2007 Wilfong became acquainted with Lars Windhorst, who was managing a German company called Vatas Holding GmbH (Vatas). Wilfong learned that Vatas was interested in purchasing large quantities of RMDX stock, but was having difficulty doing so "because of the time difference and the structure of his firm."  Wilfong agreed to purchase RMDX stock through Alki Partners and then transfer the stock to Vatas for a fee.

From April 2007 to February 2008, Wilfong caused Alki Partners to purchase large quantities of RMDX stock with the expectation that Alki Partners would then resell that RMDX stock to Vatas at a profit.  The market price of RMDX stock, which was less than $2.00 per share in April 2007, rose to a high of $4.24 on December 7, 2007, and remained at prices between $3.50 and $4.00 per share in January and early February 2008.

Initially, Wilfong's investment strategy was very profitable.  In 2007 Alki Partners was up approximately 35 percent.  Wilfong testified that during this period, "People were starting to beat down my door to get in."

However, in February 2008, when about 80 percent of Alki Partners' holdings were in RMDX stock—expected trades with Vatas did not close.  Wilfong testified Vatas "reneged their trades . . . ."

Within just a few days, RMDX stock price plummeted—from $3.09 per share on February 11 to $1.52 per share on February 15.  Wilfong testified in deposition, "[T]he trades broke.  Stock had collapsed."

With Alki Partners owning a large amount of high-priced RMDX stock with no one to whom to sell it, Wilfong went to Germany to negotiate a resolution with Vatas. Wilfong believed Vatas was supported "by a family . . . worth $8 billion. Vatas had over a billion dollars worth of public assets that were shown." Wilfong thought the "trades were going to settle out."

In late February 2008, Wilfong (through Alki Capital, among other entities) and Vatas entered into a "confidential" settlement agreement entitled "Heads of Terms for Settlement" (Settlement). In the Settlement, Vatas agreed to pay approximately $5 million no later than March 6, 2008, as "collateral." Additionally, Vatas granted Alki Partners a "put option" for 3,441,000 shares of RMDX stock at $3.84 per share, due April 30, 2008.[4]

The Settlement contains a "Confidentiality" provision, stating the terms of settlement "and all communications between the parties related directly or indirectly thereto . . . are of a confidential nature and shall not be disclosed except to directors or employees of either [p]arty with a need to know or to advisors under duty of confidentiality to such [p]arty." In deposition testimony, Wilfong explained that Vatas insisted on such confidentiality:

> "I thought I was the only one that he [(Lars Windhorst, of Vatas)] owed money to. Turns out later on we found out he owed money to lots of people. And he wanted us—the only way he was going to send us money is if I didn't tell my investors what was going on. [¶]

---

[4]    A put option is an option contract giving the owner the right, but not the obligation, to sell a specified amount of an asset at an agreed price on or before a particular date. The value of the 3,441,000 shares at $3.84 per share was $13,213,440.

10

It was an absolute—that was his No. 1 thing. . . . I was highly regulated. Last thing he wanted was to have U.S. regulatory authorities coming in because he had his entity and he was trying to juggle all these balls and keep them up. [¶] . . . [¶] . . . So he was afraid if I went to my investors in February and told them exactly what was going on . . . Vatas would be shut down. [¶] . . . So it was—it was Vatas's deal that if we told anybody anything, we wouldn't have gotten any money."

I. *Wilfong Instructs Hedgeworks Not to Communicate with Investors*

To maintain the confidentiality of the Settlement, Wilfong instructed Hedgeworks "not to say anything." Wilfong and his lawyers "bound the administrators not to disclose information to investors." In deposition testimony, Wilfong further explained:

"Q: What did you instruct the administrators to do if they got questions from the investors about this stuff?

"A: I told them not to say anything.

"Q: Who did you tell that to?

"A: All of them. It was not my administrator's responsibility to ever interface with my investors. That—that wasn't their job. That was—they'd be breaking confidentiality agreements with me and stuff; so I told them if any of my investors reached out to them, direct them back to me.

"Q: And you had authority to give that instruction?

"A: Absolutely.

"Q: You expected them to obey that instruction?

"A: I did, and if they had—if they had broken that, it would have gone back to Lars [Windhorst], we wouldn't have gotten any money out of Vatas."

Wilfong instructed Hedgeworks to refer any investor inquiries to himself. An e-mail Wilfong sent to Hedgeworks in June 2008 states:

11

"The counter party [(Vatas)] in the unsettled trades is making progress and I am feeling more confident everyday. . . . If [investors] call you please remember that the settlement agreement is confidential and refer them to either me or the fund's attorneys . . . ."

J. *Wilfong Instructs Hedgeworks to Not Issue NAV's*

Pending full performance of the Vatas Settlement, Wilfong directed Hedgeworks to *not* prepare NAV's to send to investors. In deposition testimony, a Hedgeworks representative testified:

> "The reason why we didn't issue an NAV is because we were directed by Mr. Wilfong to not issue investor statements to the investors."

In Wilfong's own words, he "froze the NAV." He further explained in his deposition testimony:

> "'If the counterparty [(Vatas)] didn't follow through [on the Settlement], the loss was material enough that I didn't feel comfortable issuing official NAV's. I spoke to our administrators and told them I was going to suspend issuing official NAV's unless this situation was resolved.' [¶] . . . [¶] . . . [As] . . . the GP [general partner], . . . I froze the NAVs until this problem was fixed."

In April 2008 Alki Capital sent a letter to investors, explaining, "Our fund recently experienced settlement issues with a number of trades we executed with a single counterparty," and "[w]e entered into a written agreement with the counterparty to protect us against losses." The letter also stated that Alki Capital "will not be releasing performance data pending the resolution of these settlement issues."

Wilfong also spoke to the investors by telephone. He testified, "If they had questions, I answered what I could, let them know where we were, what was going on . . . we'd received some money, that I think we're going to be made whole, that . . . I

12

had a confidentiality agreement with these people and that I didn't want to break it because I want to get all our money back." Wilfong decided it was not appropriate to report a value for Alki Partners' assets (and therefore it did not provide Hedgeworks with asset values) unless Vatas fully performed under the Settlement. In deposition testimony, Wilfong explained that even though Alki Partners' auditor, PriceWaterhouse, valued the options Vatas had given in the Settlement, he determined it was inappropriate to use those values to calculate NAV for the investors:

> "He [(Vatas)] wasn't fulfilling his obligations. . . . I didn't feel comfortable until—we got our money 100 percent that the NAV should go out. I thought it would be . . . fraudulent for me to go out and represent an NAV when we had half the assets of our fund in these . . . instruments. [¶] I wanted to get the money in . . . before I put out a real NAV."

In a letter to an investor, Wilfong explained, "After the original [Vatas] agreement was in place my initial intention was to put out Alki's official NAV as normal; however, with the underlying security [RMDX stock] continuing to go down I didn't feel comfortable and thought it would be unethical to issue official NAV's."

In the ordinary course of business, Hedgeworks would have received asset values at the end of February 2008 and used them to calculate NAV's and investor balances to distribute by mid-March. However, without Alki Partners providing or approving the asset value of the RMDX stock and put options in the Settlement, Hedgeworks could not calculate the NAV or the investors' respective interests in the fund.

13

L. *Hedgeworks Resigns*

Vatas paid Alki Partners another $2 million in June 2008. However, Vatas did not pay the remaining $1 million collateral, nor did Vatas honor the put options it granted in the Settlement.

In July 2008 Hedgeworks notified Alki Partners it was immediately terminating its administration services "in light of recent events" with the Alki Partners' funds "and due to the lack of transparency available to us." Although the Agreement provided for 60-days' notice of termination, Alki Partners agreed to the immediate termination.

M. *Procedural History*

1. *Plaintiffs' first amended complaint*

Alki Partners, Alki Fund, and Bullfrog (plaintiffs) sued Hedgeworks and HFSL in a first amended complaint as follows:

  1. Alki Fund alleged breach of contract;

  2. Alki Partners alleged breach of contract;

  3. As assignee of investors' claims, and as an alleged third party beneficiary of the contract, Bullfrog alleged breach of contract;

  4. All plaintiffs alleged breach of fiduciary duties.

More specifically, the first amended complaint alleged Hedgeworks breached its contractual duties in the following respects:

  1. "[F]ailing and refusing to calculate NAVs for the investors' accounts;"

  2. "[F]ailing and refusing to alert investors and/or agents of the funds of their inability to calculate NAVs and the reasons therefor;"

14

3. "[F]ailing and refusing to communicate with investors in response to their direct inquiries;"

4. "[M]aintaining as confidential the facts behind its inability to calculate NAVs for the investors' accounts."

### 2. *Hedgeworks's cross-complaint*

Hedgeworks filed a first amended cross-complaint containing allegations against Alki Partners, Alki Capital, and Wilfong for express contractual indemnity and equitable indemnity.

### 3. *Demurrer to first amended complaint*

The court sustained a demurrer to the breach of fiduciary duty cause of action, with leave to amend.[5] Plaintiffs did not amend and have not challenged that ruling here.

### 4. *March 2014 rulings*

Subsequently, as discussed *ante,* the court dismissed HFSL from the action because HFSL was dissolved before plaintiffs commenced the lawsuit. Plaintiffs do not challenge this ruling.

Based on evidence that Hedgeworks was not a party to the fund administration agreement for the Cayman Islands-based Alki Fund, Ltd, the court dismissed the claims of Alki Fund, Ltd. (and its investors, through Bullfrog). In issuing this ruling, the court determined that the administrative services agreement dated August 1, 2005, "is the hedge fund administration contract relating to Alki Fund, Lt[d]." This ruling is also not challenged on appeal.

---

5     The record does not include the order sustaining the demurrer; however, the parties' briefs agree on this point.

15

As a result of these rulings, only the second cause of action (breach of contract by Alki Partners against Hedgeworks) and the third cause of action (breach of contract by Bullfrog against Hedgeworks) remained in the case.

5. *Motion for summary judgment*

In April 2014 Hedgeworks filed a motion for summary judgment, asserting (among other grounds) the undisputed evidence established it did not breach the Agreement because: (1) By not providing Hedgeworks with a value of the fund's assets, Alki Partners did not fulfill a condition precedent to Hedgework's obligation to calculate NAV's; and (2) Alki Partners instructed Hedgeworks to not communicate with investors, and therefore cannot assert Hedgework's compliance with such directions breached the Agreement.

Plaintiffs filed opposition. Relying heavily on provisions in the (inapplicable) 2005 administrative services agreement between Alki Fund, Ltd., and HFSL, they asserted Alki Partners "had nothing to do with valuing the assets" and Hedgeworks was contractually obligated to value the assets and calculate NAV's. Plaintiffs also argued the "anti-fraud safeguards provided by a fund administrator" obligated Hedgeworks to communicate with the investors, despite Alki Partners' contrary instructions to Hedgeworks. Plaintiffs also asserted the RMDX stock trades were the product of a fraudulent scheme between Hedgeworks and Wilfong to "cook the books" by increasing Hedgeworks's own profitability, making it "a more attractive candidate to be acquired by a larger organization."

16

In reply, Hedgeworks asserted its contractual duties were determined by the Agreement alone, which created no duty to police the discretionary decisions of Alki Partners. Hedgeworks's reply noted plaintiffs had misquoted provisions in the Agreement and relied on terms in the Cayman Islands contracts that were inapplicable.

The court conducted a hearing. As the following colloquy shows, plaintiffs' counsel agreed the material facts were undisputed:

> "The Court: [T]his appears to be a purely legal issue. You're not disagreeing on what occurred here. You're not disagreeing that Wilfong told them not to—didn't give them the information they needed to write the reports. And he told them not to send reports. He told them not to have direct communication with the investors. I mean, you're both agreeing that that's what occurred. The question is, is that a breach of contract? That's legal. That's not a triable issue. You agree on what the facts are.
>
> "Mr. Shalvoy: Well, and we submit the evidence submitted, the PriceWaterhouse fraud risk assessment memo, clearly establishes that the only reason for this contract is to protect investors.
>
> "The Court: All right. Thank you."

After taking the matter under submission, the court granted summary judgment to Hedgeworks on several alternative grounds. Among other rulings, the court determined "Hedgeworks['s] performance obligations under the contract were excused by failure of a condition precedent. Specifically, the evidence shows that Hedgeworks had no obligation to prepare investor statements because Alki [Partners] did not provide the necessary value upon which those calculations would be based . . . ."

The court also determined the "undisputed material facts and evidence establish that Alki [Partners] instructed Hedgeworks not to issue statements to Alki [Partners']

17

investors, thus waiving Hedgeworks['s] performance and Alki [Partners] is estopped from now contending that Hedgeworks breached its contract with Alki [Partners] by following Alki [Partners'] own instructions."

The court also granted summary judgment to Hedgeworks on the third cause of action by Bullfrog because those claims "are derivative claims belonging to Alki [Partners]."

The Agreement provides Hedgeworks shall not be liable to Alki Capital "except to the extent such losses result from willful misconduct, gross negligence, fraud or dishonesty by Administrator in the performance of its obligations and duties . . . ." The court also granted summary judgment on the grounds that "even if Hedgeworks' following of Alki [Partners'] instructions could be interpreted to constitute a technical breach . . . Alki [Partners'] claims still fail because of the . . . provision limiting Hedgeworks['] liability."

Additionally, the court ruled, "Plaintiffs' claims also fail for admitted lack of loss causation."

Later, the court awarded Hedgeworks $3,027,237.96 in attorney fees based on an indemnity provision in the Agreement.

After Hedgeworks dismissed its first amended cross-complaint without prejudice, this appeal followed.[6]

---

[6] The parties do not address whether the dismissal *without* prejudice renders the judgment nonappealable. Because the record does not indicate the dismissal was

18

DISCUSSION

## I.  *THE STANDARD OF REVIEW*

"'We review a grant of summary judgment de novo and decide independently whether the facts not subject to triable dispute warrant judgment for the moving party as a matter of law.'"  (*Griffin v. The Haunted Hotel, Inc.* (2015) 242 Cal.App.4th 490, 498.)

## II.  *THE COURT CORRECTLY GRANTED SUMMARY JUDGMENT*

A.  *Appellants Have Forfeited Their Argument by Citing Their Own Points and Authorities Rather Than Evidence*

We begin by noting a few cardinal principles of appellate review.  We start with the presumption the judgment is correct.  (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133.)  An appellant has the burden to demonstrate error.  (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.)  An appellant who fails to cite accurately to the record forfeits the issue or argument on appeal that is presented without the record reference.  (*City of Lincoln v. Barringer* (2002) 102 Cal.App.4th 1211, 1239 (*City of Lincoln*).)

California Rules of Court,[7] rule 8.204(a)(1)(C) provides that each brief must "[s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears."  The purpose of this rule is to enable appellate justices and staff attorneys to locate relevant portions of the record expeditiously.  (*City of Lincoln, supra,* 102 Cal.App.4th at p. 1239, fn. 16.)

---

accompanied by any agreement for future litigation, the judgment is sufficiently final to be appealable.  (See *Kurwa v. Kislinger* (2013) 57 Cal.4th 1097, 1105.)

[7]    All references to rules are to the California Rules of Court.

Plaintiffs did not comply with rule 8.204(a)(1)(C).  In the "Argument" section of the opening brief, they assert, "Alki [Partners] had no obligation to value fund assets." To support that assertion, plaintiffs cite only to their trial court points and authorities. The opening brief also asserts, "a triable issue of fact exists whether Alki [Partners] waived [Hedgeworks's] performance by instructing it not to issue monthly statements." As support for this assertion, plaintiffs again cite only to their own points and authorities filed in opposition to the motion for summary judgment.

Citing points and authorities filed in the trial court is not appropriate support for factual assertions in a brief.  Points and authorities are not presented under penalty of perjury.  Matters set forth in points and authorities are not evidence.  (*Brehm Communities v. Superior Court* (2001) 88 Cal.App.4th 730, 735.)  Evidence appears elsewhere—in deposition testimony, discovery responses, and declarations.  The "Argument" section in the appellants' opening brief should have cited to those pages of the record.[8]

By failing to support the factual assertions in their legal arguments with citations to the evidence, plaintiffs have forfeited their argument the court erred in granting

---

[8] The factual portion of appellants' opening brief does contain citations to evidence. However, such citations do not cure the failure to cite evidence in the argument section of the brief, and we will not pick and choose the portions of the brief in the statement of facts that we may think are applicable to each assertion in the argument.  Rule 8.204(a)(1)(C) is intended to enable the reviewing court to locate relevant portions of the record "without thumbing through and rereading earlier portions of a brief."  (*City of Lincoln, supra,* 102 Cal.App.4th at p. 1239, fn. 16.)  To provide record citations for alleged facts at some points in a brief, but not at others, frustrates the purpose of that rule, and courts will decline to consider any factual assertion unsupported by record citation at the point where it is asserted.  (*Ibid.*)

summary judgment.  (*City of Lincoln, supra,* 102 Cal.App.4th at p. 1239 [arguments not supported by adequate citations to record need not be considered on appeal].)  In reviewing a ruling on a motion for summary judgment, "de novo review does not obligate us to cull the record for the benefit of the appellant in order to attempt to uncover the requisite triable issues.  As with an appeal from any judgment, it is the appellant's responsibility to affirmatively demonstrate error and, therefore, to point out the triable issues the appellant claims are present by citation to the record and any supporting authority."  (*Lewis v. County of Sacramento* (2001) 93 Cal.App.4th 107, 116, disapproved on other grounds in *Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc.* (2005) 133 Cal.App.4th 26, 41-42.)

   B.  *The Court Correctly Entered Summary Judgment*

   Notwithstanding plaintiffs' forfeiture, we have examined the record and conclude the court properly entered summary judgment.

   1.  *Failure to calculate NAV*

   Plaintiffs' first amended complaint alleges Hedgeworks breached the Agreement by "failing and refusing to calculate NAVs for the investors' accounts."  However, the undisputed evidence is that Hedgeworks's ability to calculate NAV was dependent upon Alki Partners providing values for the fund's assets.  In deposition, Wilfong testified, "Hedgeworks had nothing to do with the valuation."  He explained that Alki Partners was responsible for providing asset values to Hedgeworks:

> "Q:  So I wanted to ask you about that part of Schedule A that says:
> [¶] 'The value of assets will be recorded at their fair value as

21

determined in good faith by the client.' [¶] You understood that that was part of the function of Alki Partners?

"A: That was my function, yeah, as the—the GP, as the managing— I'm the one that came up with the valuations.

"Q: And before you—in order to do a calculation of net asset value, you have to have a valuation from someone, correct?

"A: Correct. Yes."

Wilfong decided to not value the put options in the Vatas settlement until the situation with Vatas was resolved, and therefore he did not provide Hedgeworks with a value for those assets. As Wilfong explained in a letter addressed to an investor:

"After the original [Vatas] agreement was in place my initial intention was to put out Alki Partners' official NAV as normal; however, with the underlying security continuing to go down, I didn't feel comfortable and thought it would be unethical to issue official NAV's. *I spoke to our administrators and told them I was going to suspend issuing official NAV's until this situation was resolved . . . .*" (Italics added.)

In deposition, Wilfong testified he directed Hedgeworks to not calculate NAV, stating, "I froze the . . . NAVs until this problem was fixed." Wilfong further explained:

"Q: So I don't understand why the NAVs weren't prepared and sent out. [¶] . . .

"A: . . . I didn't feel comfortable until—until we got our money 100 percent that the NAV should go out. I thought it would be fraudulent for me to go out and represent an NAV when we had half the assets of our fund in these—these . . . instruments. [¶] I wanted to get the money in and—in it before I put out a real NAV."

Based on this evidence, the court properly determined the undisputed material facts establish Hedgeworks did not breach the Agreement by not calculating NAV's for the investors' accounts. A party's failure to perform a condition precedent will preclude

22

an action for breach of contract. (*Richman v. Hartley* (2014) 224 Cal.App.4th 1182, 1192.) Where one party's obligation is dependent on the prior proper performance of the other party, and that other party does not perform, the obligation is excused. (*Mainieri v. Magnuson* (1954) 126 Cal.App.2d 426, 429 (*Mainieri*).)

Here, the undisputed evidence established Hedgeworks could not calculate NAV unless and until Alki Partners provided Hedgeworks with the value of the fund's assets (consisting mostly of RMDX stock and the value of the put options in the Settlement). The undisputed evidence also established that Alki Partners refused to supply such data. The court therefore correctly determined that Hedgeworks's contractual obligation to calculate and disseminate NAV's was excused for failure of the condition precedent. (*Mainieri, supra,* 126 Cal.App.2d at p. 429 ["The failure of appellant to perform this condition precedent excused respondent's performance which was dependent on it."].)

Plaintiffs' arguments to the contrary are not persuasive. First, they assert Alki Partners "had no obligation to value fund assets." Plaintiffs further contend, "the fund administration agreements were clear in this regard." However, all the relevant evidence is to the contrary. Without contradiction, Wilfong testified that pending Vatas's performance under the Settlement, the fund's assets could not be appropriately valued:

> "'If the counterparty [(Vatas)] didn't follow through, the loss was material enough that I didn't feel comfortable issuing official NAVs. I spoke to our administrators and told them I was going to suspend issuing official NAVs until this situation was resolved.' [¶] . . . [¶] . . . [T]he stock—it went from a small loss to a massive loss, and I think . . . at that time I made the decision . . . it would be  . . . inappropriate to be putting out the NAVs like there was— there were no problems . . . ."

23

Section 2(d) of the Agreement provides that under such circumstances—i.e., where Alki Partners determined market quotations were not indicative of an asset's fair value—Alki Partners was solely responsible for valuing fund assets:

> "The value of assets will be recorded at their fair value as determined in good faith by the Client in the absence of current quotations or if Client[] concludes that such quotations are not indicative of fair value by reason of illiquidity of a particular security or other factors. Independent appraisals generally will not be obtained in these situations. Securities or other assets that are not readily marketable generally will be valued as determined in good faith by the Client based upon the most appropriate information available at that time."[9]

Ignoring section 2(d) of the Agreement, plaintiffs instead quote provisions in the August 1, 2005 administrative services agreement between Alki Fund and HFSL. That contract states *the administrator* will "calculate the value of the assets and liabilities of the Fund."

However, plaintiffs cannot rely on the August 1, 2005 administrative services agreement to create a triable issue of fact here because (1) Hedgeworks was not a party to that 2005 agreement; (2) plaintiffs concede as an "undisputed" fact the Agreement (dated January 1, 2002) "is the contract for the provision of hedge fund administration services" to Alki Partners; and (3) the trial court dismissed all of Alki Fund's claims in this case, a ruling plaintiffs do not challenge on appeal.

---

9    Plaintiffs' briefs contains only an incomplete quotation of the relevant provision in the Agreement about valuation. They omit and ignore the contractual language: "The value of assets will be recorded at their fair value as determined in good faith by the Client in the absence of current quotations or if Client[] concludes that such quotations are not indicative of fair value by reason of illiquidity of a particular security or other factors."

24

Plaintiffs also assert a triable issue exists that Hedgeworks was obligated to value fund assets because "[t]here is an inherent conflict in allowing Alki [Partners] to value assets because the fund manager's compensation is tied to the value of the assets he is managing." However, any such conflict, even assuming it exists, does not negate unambiguous contract language in the Agreement that "[t]he value of assets will be recorded at their fair value as determined in good faith by the Client in the absence of current quotations or if Client[] concludes that such quotations are not indicative of fair value . . . ." (See *Estate of Bodger* (1955) 130 Cal.App.2d 416, 425 ["'It is not the province of the court to alter a contract by construction or to make a new contract for the parties; its duty is confined to the interpretation of the one which they have made for themselves, and, in the absence of any ground for denying enforcement, to enforcing or giving effect to the contract as made . . . without regard to its wisdom or folly . . . .'"].)

Plaintiffs further contend it is undisputed Hedgeworks could value the RMDX stock itself. However, the put options in the Vatas Settlement were also fund assets. The Alki Partners' limited partnership agreement defines "securities" in which the fund could invest to include "options" and "puts." Moreover, the witness plaintiffs designated as the person most knowledgeable about their claims, Hilaire Atlee, testified the Vatas put options were fund assets:

"Q: Is a put option an asset?

"Mr. Shalvoy: Same objection.

"A: It is.

"Q: And the owner of this asset would be the grantee of the option?

25

"A:  Yes.

"Q:  So the owner would be [Alki Partners]?

"Mr. Shalvoy:  Same objection.

"A:  Correct."

Without contradiction, Wilfong testified he was unable to value the Vatas put options, stating, "I thought it would be . . . fraudulent for me to go out and represent an NAV when we had half the assets of our fund in these—these . . . instruments.  [¶] I wanted to get the money in and—in it before I put out a real NAV."[10]

2.  *Failure to communicate with investors*

Under the Agreement, Hedgeworks was required to engage in "[i]nvestor [r]elations" and communicate with investors on an "[a]s [n]eeded" basis and "only when specifically instructed by Client."

Plaintiffs' first amended complaint alleges Hedgeworks breached the Agreement by failing to communicate with investors.  More specifically, the first amended complaint alleges Hedgeworks breached the Agreement by failing to (1) "communicate with investors in response to their direct inquiries," and (2) "alert investors and/or agents of the funds of their inability to calculate NAVs and the reasons therefor."  The first

---

[10]    In their reply brief, plaintiffs cite a July 2008 e-mail from Hedgeworks to Wilfong as evidence Hedgeworks "admitted tht it never considered the Vatas 'agreement' to be a fund asset."  However, that e-mail contains no such admission.  In the e-mail, Hedgeworks explains it has been unable to calculate a NAV since January 31, 2008, because the outcome of the Vatas Settlement remained uncertain and "we cannot report unsubstantiated numbers to your investors."

26

amended complaint also alleges Hedgeworks breached the Agreement by "maintaining as confidential the facts behind its inability to calculate NAVs for the investors' accounts."

The court properly determined these claims fail as a matter of law because the undisputed evidence establishes Alki Partners instructed Hedgeworks to not send monthly statements to investors and to not communicate with investors. Wilfong testified the Vatas Settlement was confidential, and "if we told anybody anything, we wouldn't have gotten any money." Wilfong testified that Hedgeworks "had no legal authority to tell my investors anything." Wilfong and his lawyers "bound the administrators not to disclose information to investors." Alki Partners instructed Hedgeworks to *not* communicate with investors:

> "Q: What did you instruct the administrators to do if they got questions from the investors about this stuff?
>
> "A: I told them not to say anything.
>
> "Q: Who did you tell that to?
>
> "A: All of them. It was not my administrator's responsibility to ever interface with my investors. That—that wasn't their job. That was—they'd be breaking confidentiality agreements with me and stuff, so I told them if any of my investors reached out to them, direct them back to me.
>
> "Q: And you had authority to give that instruction?
>
> "A: Absolutely.
>
> "Q: You expected them to obey that instruction?
>
> "A: I—I did, and if they had . . . broken that, it would have gone back to Lars [Windhorst], we wouldn't have gotten any money out of Vatas."

The trial court correctly determined that Hedgeworks did not breach the Agreement by following Alki Partners' instructions to not communicate with investors. To begin with, other than sending monthly NAV statements to investors (discussed *ante*), the Agreement provides Hedgeworks will communicate with investors "only when specifically instructed by Client." Alki Partners specifically instructed Hedgeworks to *not* communicate. As quoted above, Wilfong told his administrators to refer all investor inquiries to himself. In an e-mail dated June 23, 2008, Wilfong reminded Hedgeworks, "If they [(investors)] call you please remember that the settlement agreement [(with Vatas)] is confidential and refer them to either me or the fund's attorneys . . . ."

The court correctly determined Hedgeworks cannot breach its Agreement with Alki Partners by complying with Alki Partners' own directions. In analogous circumstances, the court in *Sutherland v. Barclays American/Mortgage Corp.* (1997) 53 Cal.App.4th 299 (*Sutherland*) stated:

> "'We know of no principle of law . . . which will permit a party to a contract, who is entitled to demand the performance by the other party of some act within a specified time, and who has consented to the postponement of the performance to a time subsequent to that fixed by the contract, and where the other party has acted upon such consent, and in reliance thereon has permitted the contract time to pass without performance, to subsequently recall such consent and treat the non-performance within the original time as a breach of the contract.'" (*Sutherland, supra,* 53 Cal.App.4th at pp. 311-312.)[11]

---

[11] Plaintiffs attempt to distinguish *Sutherland* on the grounds the Agreement here contains a no-oral modification clause, whereas there is no mention of such a provision in the contract involved in *Sutherland*. This argument fails because the court in *Sutherland* rejected a similar argument. (*Sutherland, supra,* 53 Cal.App.4th at p. 311 [declaring "without merit" the position that a valid modification had to be in writing].) Moreover,

28

Plaintiffs do not deny or dispute that Alki Partners directed Hedgeworks to not communicate with the investors. Instead, they contend Hedgeworks agreed to not communicate with investors to "prevent the collapse of the Alki [Partners'] funds" and thus increase Hedgeworks's own value and performance bonus. In their reply brief, plaintiffs assert, "It is also reasonable to infer that [Hedgeworks] did not disclose the RMDX trading problems in order not to alarm investors and derail Wilfong's efforts to raise $100 million."

Plaintiffs also contend a triable issue exists whether Hedgeworks failed to communicate with investors "to further its own financial self interest" and not because of any instruction from Alki Partners. They claim that in 2005, Hedgeworks was losing money and decided to "cook Alki [Partners'] books" to increase Hedgeworks's fees and make it a more attractive acquisition for Deutsche Bank. Plaintiffs assert the evidence reasonably shows Hedgeworks was in "collusion" with Wilfong to further its own financial interests at the investors' expense and loss. They essentially assert Wilfong and Hedgeworks conspired to create false "'pricing memos'" that "grossly inflated the asset prices in the Alki [Partners'] accounts." Plaintiffs contend the evidence shows Hedgeworks agreed to help Wilfong hide huge investment losses from the investors. Plaintiffs also contend the evidence is reasonably susceptible to an inference that Hedgeworks did not inform investors of the RMDX problems in order to secure its own $22 million performance bonus as it anticipated being acquired by Deutsche Bank.

contrary to plaintiffs' assertion, Wilfong's instructions to not communicate were given both orally and in a writing, an e-mail.

29

In this action for alleged breach of contract, all of these assertions are unavailing. The trial court dismissed plaintiffs' breach of fiduciary duty claims against Hedgeworks, and plaintiffs do not challenge that ruling on appeal. Because plaintiffs' claims are limited to those alleging breach of the Agreement, Hedgeworks's motives are irrelevant. (See *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 516 ["the law generally does not distinguish between good and bad motives for breaching a contract"].) A party's purported motive to breach a contract is not relevant to the issue of whether there has been a breach. If failing to communicate with investors was not otherwise a breach of contract, there was no breach even if Hedgeworks's failure to communicate with investors stemmed from a bad motive, greed, or other self-interest. (*JRS Products, Inc. v. Matsushita Electric Corp. of America* (2004) 115 Cal.App.4th 168, 182 ["motive, regardless of how malevolent, remains irrelevant to a breach of contract claim"].)

3. *Immediate resignation*

The Agreement provides it may be "terminated by either party hereto upon at least 60 days' written notice . . . ." On July 16, 2008, Hedgeworks wrote to Alki Capital, stating it was terminating its services under the Agreement "effective immediately." The same day, after receiving the letter, Wilfong signed underneath a line stating, "Acknowledged and Agreed." In deposition testimony, Wilfong stated he agreed to the resignation.

Plaintiffs contend the court erroneously granted summary judgment because there is a triable issue Hedgeworks breached the Agreement by not giving 60-days' notice of

30

termination. However, plaintiffs' first amended complaint does not plead the immediate resignation as constituting a breach of contract. Because the pleadings set the boundaries of the issues to be resolved in a motion for summary judgment, Hedgeworks was not required to refute liability on a theory not included in the operative complaint. (*Hutton v. Fidelity National Title Co.* (2013) 213 Cal.App.4th 486, 499.) Moreover, the undisputed evidence is Alki Partners consented in writing to the immediate resignation. Accordingly, the court properly entered summary judgment against Bullfrog because all of Alki Partners' claims alleged in the first amended complaint fail as a matter of law.

### III. *THE COURT ERRED IN AWARDING ATTORNEY FEES*

A. *Factual Background*

There is no prevailing party attorney fees clause in the Agreement. After the court granted summary judgment, Hedgeworks sought $3,027,237.96 in attorney fees under an indemnity provision in the Agreement, which provides in part:

> "5. **Standard of Care**. Neither [Hedgeworks] nor any of its affiliates, members, officers, directors, employees or agents, shall be liable to [Alki Partners] or the Account for any acts or omissions or any error of judgment or for any loss suffered by the Account in connection with the subject matter of this Agreement, except to the extent such losses result from willful misconduct, gross negligence, fraud or dishonesty by [Hedgeworks] in the performance of its obligations and duties, or by reason of [Hedgework's] reckless disregard of its obligations and duties hereunder. [Alki Partners] shall indemnify [Hedgeworks] . . . against any and all costs, losses, claims, damages or liabilities, joint or several, including without limitation, reasonable attorneys' fees and disbursements, resulting in any way from the performance or non-performance of [Hedgeworks's] duties hereunder, except those resulting from the willful misconduct, gross negligence, fraud or dishonesty of [Hedgeworks] or [Hedgeworks's] reckless disregard of its obligations and duties hereunder, and in the case of criminal proceedings, unless

31

[Hedgeworks] had reasonable cause to believe its actions unlawful . . . .

"Notwithstanding any of the foregoing to the contrary, the provisions of this **paragraph 5** shall not be construed so as to relieve [Hedgeworks] of, or provide indemnification with respect to, any liability to the extent (but only to the extent) that such liability may not be waived, limited or modified under applicable law or that such indemnification would be in violation of applicable law, but shall be construed so as to effectuate the provisions of this **paragraph 5** to the fullest extent permitted by law."

In its attorney fee motion, Hedgeworks stated it was not seeking attorney fees incurred in defending any third party claim. Rather, Hedgeworks explained it was seeking "only to recover the attorneys' fees it spent defending against the claims unsuccessfully brought against it by its contractual counterparty, Alki [Partners]." Hedgeworks asserted this indemnity provision afforded a right to prevailing party attorney fees in an action between the parties to the contract for its alleged breach.

Plaintiffs did not challenge the reasonableness of the amount sought (over $3 million), but argued: (1) the Agreement lacked an attorney fee provision for the prevailing party in litigation on the contract itself, and (2) recovery of attorney fees under the indemnity provision required Hedgeworks to first prevail on its cross-complaint for indemnity. The court rejected plaintiffs' arguments and awarded Hedgeworks the entire $3,027,237.96 it requested.

B. *The Standard of Review*

Interpretation of a written contract is a question of law for the court unless that interpretation depends upon resolving a conflict in properly admitted extrinsic evidence. (*City of Hope National Medical Center v. Genetech, Inc.* (2008) 43 Cal.4th 375, 395

32

(*Genetech*).) Here, the trial court interpreted the Agreement without considering any extrinsic evidence. Therefore, we exercise our independent judgment in interpreting the indemnity provision, giving no deference to the trial court's ruling. (*Rideau v. Stewart Title of California., Inc.* (2015) 235 Cal.App.4th 1286, 1295 (*Rideau*).)

C. *Forfeiture*

There is one other preliminary issue. As explained *post,* we conclude the court erroneously interpreted the third party indemnity provision in the Agreement to provide a right to prevailing party attorney fees in an action between the parties to the Agreement for breach. In the opening brief, plaintiffs do not make this argument, instead asserting the court erred in awarding fees without first adjudicating the merits of Hedgeworks's cross-complaint for indemnity.

Generally, issues not raised in the opening brief are forfeited. (See *Reyes v. Kosha* (1998) 65 Cal.App.4th 451, 466, fn. 6.) However, "[i]t is important to remember . . . that the purpose of this general rule is to give the trial court and parties an opportunity to correct an error that *could* be corrected by some means short of an opposite outcome in the trial court." (*Woodward Park Homeowners Assn., Inc. v. City of Fresno* (2007) 150 Cal.App.4th 683, 712 (*Woodward Park*).) Thus, as an exception to this general rule, the appellate court has discretion to consider an issue raised for the first time on appeal where the relevant facts are undisputed and could not have been altered by the presentation of additional evidence in the trial court. (*Tsemetzin v. Coast Federal Savings & Loan Assn*. (1997) 57 Cal.App.4th 1334, 1341, fn. 6.) "It makes no difference

that the issue was first raised on appeal by the court rather than the parties, as long as the parties have been given a reasonable opportunity to address it." (*Ibid.*)

The attorney fee issue we are now considering falls within this exception. The question is whether the Agreement provides for an award of attorney fees to the prevailing party in an action for breach between the parties to the Agreement. As noted, here this is an issue of law. (*Genetech, supra,* 43 Cal.4th at p. 395.) Plaintiffs' failure to raise this issue in their opening brief "does not bar our consideration of it if the parties have had a fair opportunity to present their positions." (*Woodward Park, supra,* 150 Cal.App.4th at p. 714.) Before oral argument, we asked the parties to submit supplemental briefs on this issue, which we have considered.

D. *The Indemnity Provision Is Not an Attorney Fee Clause*

"Generally, indemnity is defined as an obligation of one party to pay or satisfy the loss or damage incurred by another party." (*Rideau, supra,* 235 Cal.App.4th at p. 1294.) "A contractual indemnity provision may be drafted either to cover claims between the contracting parties themselves, or to cover claims asserted by third parties." (*Ibid.*)

Indemnity agreements are construed under the same rules that govern the interpretation of other contracts. (*Myers Building Industries, Ltd. v. Interface Technology, Inc.* (1993) 13 Cal.App.4th 949, 969 (*Myers*).) Accordingly, the contract must be interpreted to "give effect to the mutual intention of the parties . . . ." (Civ.

34

Code,[12] § 1636.)  The intention of the parties is to be ascertained from the "clear and explicit" contract language.  (§ 1638.)

Generally, an indemnification provision allows one party to recover costs incurred defending actions by third parties, not attorney fees incurred in an action between the parties to the contract.  (*Rideau, supra,* 235 Cal.App.4th at p. 1298.)  Courts look to several indicators to distinguish third party indemnification provisions from provisions for the award of attorney fees incurred in litigation between the parties to the contract.  The key indicator is an express reference to indemnification.  A clause that contains the words "indemnify" and "hold harmless" generally obligates the indemnitor to reimburse the indemnitee for any damages the indemnitee becomes obligated to pay third persons— that is, it relates to third party claims, not attorney fees incurred in a breach of contract action between the parties to the indemnity agreement itself.  (*Carr, supra,* 166 Cal.App.4th at p. 20.)

Courts also examine the context in which the language appears.  Generally, if the surrounding provisions describe third party liability, the clause will be construed as a standard third party indemnification provision.  (*Myers, supra,* 13 Cal.App.4th at p. 970.)  The court will not infer that the parties intended an indemnification provision to cover attorney fees between the parties if the provision "'does not specifically provide for attorney's fees *in an action on the contract . . . .*'"  (*Ibid.*; see also *Rideau, supra,* 235 Cal.App.4th at p. 1298 ["The general rule is that the specification of attorney fees as an

---

[12]    All statutory references are to the Civil Code unless otherwise specified.

item of loss in a third party claim indemnity provision . . . 'does not constitute a provision for the award of attorney fees in an action on the contract . . . .'"].)

For example, language stating, "Seller . . . agrees to indemnify and save buyer . . . harmless from any and all losses . . . including . . . reasonable attorney's fees . . . arising from any cause or for any reason whatsoever" (*Building Maintenance Service Co. v. AIL Systems, Inc.* (1997) 55 Cal.App.4th 1014, 1022) does not provide for attorney fees in an action between the parties for breach of contract. (*Id.* at p. 1030.) In such circumstances, "there is no language . . . which reasonably can be interpreted as addressing the issue of an action between the parties on the contract." (*Ibid.*)

Similarly, an indemnification clause in which one party promised to "indemnify" the other from "'any, all, and every claim' which arises out of 'the performance of the contract'" (*Myers, supra,* 13 Cal.App.4th at p. 974) deals only with third party claims, and cannot support an award of attorney fees in an action for breach of contract between the parties to the agreement. (*Ibid.*) The *Myers* court held that considering the ordinary meaning of the words "indemnify" and the context of the provisions, the contract could not be construed as separately providing for attorney fees in an action between the parties. (*Ibid.*) The *Myers* court determined the indemnity provision there did not afford a right to attorney fees incurred in breach of contract litigation between the parties to the agreement, even though, as here, the contract provided the indemnity agreement was to be enforced "[t]o the fullest extent permitted by law." (*Id.* at pp. 963-964.)

*Carr, supra,* 166 Cal.App.4th 14 is also instructive. There, the parties disputed whether the following provisions provided a right to attorney fees incurred in enforcing

36

the agreement: "'[Carr] shall indemnify and hold harmless [Chowchilla] . . . from and against all claims , damages, losses and expenses including attorney fees arising out of the performance of the work described herein . . . .'" (*Id.* at p. 19.) The *Carr* court reviewed three cases (*Myers, supra,* 13 Cal.App.4th 949; *Meininger v. Larwin-Northern California, Inc.* (1976) 63 Cal.App.3d 82 (*Meininger*) & *Campbell v. Scripps Bank* (2000) 78 Cal.App.4th 1328 (*Campbell*)) that considered whether an indemnification agreement requiring reimbursement of legal fees "arising out of" or "related to" the performance of certain duties extended to legal fees incurred in enforcing the agreement itself. In all three decisions, the courts concluded the agreements did *not* allow recovery of attorney fees incurred in enforcing the contract. (*Carr, supra,* 166 Cal.App.4th at pp. 20-22.)

The *Carr* court contrasted those decisions with *Baldwin Builders v. Coast Plastering Corp.* (2005) 125 Cal.App.4th 1339 and *Continental Heller Corp. v. Amtech Mechanical Services, Inc.* (1997) 53 Cal.App.4th 500 (*Continental*), which held such fees were recoverable where the contract included express language for "'"attorney's fees incurred in enforcing [the] indemnity agreement."'" (*Carr, supra,* 166 Cal.App.4th at pp. 22-23, italics omitted.)

The *Carr* court concluded the language of the indemnity provision under consideration "more closely parallel[ed] the language found in *Myers, Meininger,* and *Campbell* than the language at issue in *Baldwin* and *Continental*. Unlike *Baldwin,* there is no express language authorizing recovery of fees in an action to enforce the contract." (*Carr, supra,* 166 Cal.App.4th at p. 23.)

37

Here, the critical provisions in the Agreement's indemnity clause are virtually identical to the terms in *Carr* and in *Myers*. The Agreement states Alki Partners will "indemnify" Hedgeworks for all losses, including attorney fees "resulting in any way from the performance or non-performance of [Hedgeworks's] duties hereunder." This language is indistinguishable from the provision considered in *Carr*, where the indemnitor promised to indemnify "'against all claims, damages, losses and expenses including attorney fees arising out of the performance of the work described herein.'" (*Carr, supra,* 166 Cal.App.4th at p. 19, italics omitted.) It is also indistinguishable from the indemnity provision in *Myers,* which indemnified "every claim" arising "out of the performance of the contract." (*Myers, supra,* 13 Cal.App.4th at p. 974.) Furthermore, as in *Carr,* there is nothing in the indemnity provision between Alki Partners and Hedgeworks that extends the right to recover attorney fees to actions seeking to enforce the Agreement itself. Accordingly, the same conclusion reached by the courts in *Carr* and *Myers* also applies here: The indemnity provision does not provide a right to recover attorney fees incurred in breach of contract litigation between the parties to the Agreement.

Other portions of the indemnity provision in the Hedgeworks Agreement further supports the conclusion the parties intended the indemnity agreement to only apply to third party claims, and not in an action on the contract between themselves. The last clause of the indemnity provision states Alki Partners will indemnify Hedgeworks for all costs, including attorney fees "and in the case of criminal proceedings, unless [Hedgeworks] had reasonable cause to believe its actions unlawful . . . ." Thus, the

38

Agreement itself characterizes such criminal proceedings as a subset of third party claims in general. This further supports the conclusion the parties intended this to be a standard third party indemnity provision, and not a prevailing party attorney fee clause in an action between the parties to the Agreement for its breach.

In its respondent's brief, Hedgeworks relies on three cases where attorney fees were awarded in direct actions between the parties to the contract under an indemnity clause—*Zalkind v. Ceradyne, Inc.* (2011) 194 Cal.App.4th 1010 (*Zalkind*); *Dream Theater, Inc. v. Dream Theater* (2004) 124 Cal.App.4th 547 (*Dream Theater*); and *Wilshire-Doheny Associates, Ltd. v. Shapiro* (2000) 83 Cal.App.4th 1380 (*Wilshire-Doheny*). However, each of these cases is materially distinguishable.

In *Zalkind*, one party agreed to indemnify the other for losses "'whether or not they have arisen from or were incurred in or as a result of any demand, claim, action, suit, assessment or other proceeding or any settlement or judgment. . . .'" (*Zalkind, supra,* 194 Cal.App.4th at p. 1028.) The *Zalkind* court found this language was "not limited to third party claims." (*Ibid*.) No similar language appears in the Agreement.

*Dream Theater, supra,* 124 Cal.App.4th 547, is also distinguishable. There, the contract provided indemnity against all losses "'whether or not arising out of third party Claims.'" (*Id.* at p. 556.) This language clearly states the indemnification provision applied to claims other than third party claims, namely claims asserted by one party against the other. The Agreement here contains no such language.

In *Wilshire-Doheny, supra,* 83 Cal.App.4th 1380, the court considered whether particular indemnity provisions were limited to third party claims. In that case, a

39

corporation agreed to indemnify two of its corporate officers with respect to any claims or action brought against them in their capacity as corporate officers. (*Id.* at pp. 1387, 1394-1395.) The corporation sued the two officers arising out of their conduct as corporate officers. (*Id.* at pp. 1385-1386.) The indemnity provision specifically applied to an "'action or suit by or in the right of the corporation to secure a judgment in its favor.'" (*Id.* at p. 1395.) Noting this language in particular, the *Wilshire-Doheny* court held the provision afforded a right to attorney fees in an action on the contract. (*Id.* at pp. 1396-1397.) Significantly, the language in the Agreement here contains no similar language providing for a right to recover attorney fees.

In its supplemental brief, Hedgeworks contends "Section 5 is no mere third party indemnity clause." Hedgeworks notes the paragraph is entitled "Standard of Care," which governs the relationship between Hedgeworks and Alki Partners, and not third parties. Hedgeworks asserts the first sentence in section 5 concerns duties owed by Hedgeworks to Alki Partners, and the second sentence "symmetrically covers everything else," stating that in the absence of willful misconduct, gross negligence, fraud or dishonesty, Hedgeworks would be made whole by Alki Partners for any and all costs.

Hedgeworks argues, "Read as a coherent whole, Section 5 functions to hold Hedgeworks responsible if (and only if) it breaches the agreed-upon standard of care, and to protect it from any and all costs if it complies with the same standard. There is no reason to imagine that, although the title of the section and the first sentence both clearly cover the issue of liability *between the parties*, the second sentence should be read as

40

shifting gears, breaking the symmetry of the section's structure, and relating only to third parties."

We disagree with Hedgeworks' interpretation of section 5 as it relates to a right to attorney fees between the parties to the contract in an action for breach of the agreement. To begin with, if the parties intended to provide a right to prevailing party attorney fees in an action for breach of the Agreement, there could hardly be a more obtuse way of doing so than the language in section 5. It would have been simple for the parties to provide: If any action is commenced to enforce or interpret the terms of this agreement, the prevailing party shall be entitled to recover reasonable attorney fees. But section 5 does not even contain the phrase "prevailing party" or refer to an action between the parties for breach of the agreement. Courts will not infer the parties intended an indemnification provision to cover attorney fees between the parties if the provision "'does not specifically provide for attorney's fees *in an action on the contract . . . .*'" (*Myers, supra,* 13 Cal.App.4th at p. 970.)

Moreover, Hedgeworks is incorrect in asserting, "there is no reason to imagine" that the second sentence, dealing with indemnification, relates only to third party claims. Section 1641 requires the contract to be construed as a whole, "each clause helping to interpret the other."[13] Ordinarily, "where specific words follow general words in a contract, 'the general words are construed to embrace only things similar in nature to

---

13    Section 1641 provides: "The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."

those enumerated by the specific words.'"  (*Nygard, Inc. v. Uusi-Kerttula* (2008) 159 Cal.App.4th 1027, 1045.)

The last clause of the second sentence in section 5 deals exclusively with a particular type of third party claims, those arising out of criminal prosecution.  This provision states:  "[Alki Partners] shall indemnify [Hedgeworks]  . . . against any and all costs . . . *and in the case of criminal proceedings,* unless [Hedgeworks] had reasonable cause to believe its actions unlawful . . . ."  (Italics added.)  The general words in section 5 that Alki Partners "shall indemnify" Hedgeworks are properly construed to embrace "only things similar in nature" to the specific words—that is, third party claims.  (See *Nybard, supra,* 159 Cal.App.4th at p. 1045.)

In its supplemental brief, and again at oral argument, Hedgeworks contends *Hot Rods, LLC v. Northrup Grumman Systems Corp.* (2015) 242 Cal.App.4th 1166 (*Hot Rods*, LLC) supports interpreting the indemnity provision in the Agreement as affording prevailing party attorney fees in an action between the parties for breach.  However the indemnity provision in *Hot Rods, LLC* is significantly different from the one in the Agreement.  In *Hot Rods, LLC*, the provision purported to indemnify from any "claim" and defined "claim" as "any claim or demand by any Person for any alleged liabilities, whether based in contract, tort, implied or express warranty . . . ."  (*Id.* at p. 1181.)  The indemnity provision there also defined "person" broadly, so that combining the definition of "claim" and "person" encompassed "both first and third party claims."  (*Id.* at p. 1181.)  No such language appears in the Alki Partners-Hedgeworks indemnity provision.

Moreover, the court in *Hot Rods, LLC* noted that under the indemnity provision there, Hot Rods was required to give Northrup notice of any environment actions, but was not required to give similar notice for personal injury or property damage claims. The court concluded that "[t]he reasonable inference is that the second type of claim was not intended to be limited to third party claims, but contemplated claims from Hot Rods as well." (*Hot Rods, LLC, supra,* 242 Cal.App.4th at p. 1182.) The Agreement here contains no similar distinction.

In sum, section 5, entitled "Standard of Care," applies the same standard of care in two different applications. First, the standard governs potential liability between Hedgeworks and Alki Partners. Second, it applies the same standard as to Alki Partners' obligation to indemnify Hedgeworks for third party claims.

To find a right to attorney fees in a direct action under an ordinary indemnity provision, as here, would invest every agreement containing a standard third party indemnity clause with a prevailing party attorney fee clause. This is particularly inappropriate because section 1717, subdivision (a), which governs the award of contractual attorney fees, applies only when the contract "specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party . . . ." The indemnity clause here does not "specifically" refer either to actions to enforce the contract or to the prevailing party. Rather, it is a third party indemnity clause. The court erred in construing it otherwise.

As a fall-back position, Hedgeworks contends that even if an attorney fee award under section 5 is limited to defense of third party claims, the award should be affirmed because Hedgeworks incurred the fees in defending against not only Alki Partners' claims, but also against identical claims by a third party, Bullfrog.

This argument is unavailing because in the trial court, Hedgeworks took the exact opposite position. In its motion for attorney fees, Hedgeworks told the trial court, "It is important that the Court understand at the outset what Hedgeworks is *not* seeking by this motion. Hedgeworks is *not* herein seeking fees incurred solely to defend claims brought against it by . . . Bullfrog, which are third parties to the [Agreement]. . . . Put simply, by this motion, Hedgeworks seeks only to recover the attorneys' fees it spent defending against the claims unsuccessfully brought against it by its contractual counterparty, Alki LP. Hedgeworks reserves the right to seek some or all of those fees by appropriate procedures at a later time." Hedgeworks may not repudiate these representations now. (*Planned Protective Services, Inc. v. Gorton* (1988) 200 Cal.App.3d 1, 12-13 [theory of trial rule applied to attorney fee motion], disapproved on other grounds in *Martin v. Szeto* (2004) 32 Cal.4th 445, 451, fn. 7.)

## DISPOSITION

The "Amended and Final Judgment" entered May 1, 2015, is reversed insofar as it awards DB Fund Services, LLC, attorney fees, and the trial court is directed to enter a new order denying Hedgeworks motion for attorney fees. In all other respects, the amended and final judgment entered May 1, 2015, is affirmed.

In the interest of justice, each party is to bear its own costs.


NARES, J.

WE CONCUR:


HUFFMAN, Acting P. J.


HALLER, J.