Filed 4/6/21  Pini v. Fenley CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Trinity)

----

| | |
|---|---|
| FIRENZA PINI, | C088892 |
| Plaintiff and Appellant, | (Super. Ct. No. 16CV068) |
| v. | |
| JOHN FENLEY, | |
| Defendant and Respondent; | |
| THE COUNTY OF TRINITY, | |
| Real Party in Interest and Respondent. | |

Appellant Firenza Pini, an elector in Trinity County, filed an election contest action contending that Diane Richards, who lost the vote in 2016 for District 5 Supervisor of Trinity County to defendant John Fenley by 352 to 380 votes, a margin of 28 votes, would have won but for mistakes, errors or misconduct in processing and counting ballots.  After five days of trial, the trial judge granted a motion for judgment under Code of Civil Procedure section 631.8 brought by Fenley and Trinity County.

1

On appeal, Pini contends the trial court: (1) erred in granting the motion for judgment; (2) abused its discretion in declining to reopen the case to admit additional testimony; (3) abused its discretion in allowing Trinity County to intervene in the case without filing a motion to intervene; (4) denied Pini her constitutional right to a fair trial; and (5) violated Pini's state and federal constitutional rights.

We will affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Pini's election contest was the subject of a prior appeal in which we summarized the matter as follows: "John Fenley ran for the District 5, Trinity County Board of Supervisors seat on June 7, 2016. According to the official canvass, Fenley received 380 votes, which was 28 more votes than his opponent. Having received a majority of votes cast in the June election, the 'body canvassing the returns' declared Fenley the winner on June 27, 2016, without a runoff. The official canvass was certified on July 6, 2016.

"Pini, representing herself and acting as an elector in the supervisorial district, filed a verified statement of election contest on July 26, 2016. She cited sections 16400, 16401, subdivision (d), and 16460 of the Elections Code and alleged that there was 'mistake, error or misconduct in the counting of the ballots in the elections' because (1) '[u]p to 110 "vote-by-mail" and/or provisional ballots received by the Registrar of Voters were not processed and counted and should have been processed and counted in the contested election,' (2) '[a]n unknown number of ballots[ ] of qualified, "permanent vote-by-mail voters" were not processed and[/]or counted,' (3) 'the precinct board in conducting the election or in canvassing the returns, made errors sufficient to change the result of the election as to any person who has been declared elected by denying adequate observation and right to list of vote-by[-]mail ballots and provisional ballot electors in order to effect a challenge by the observers and representatives of candidates,' and (4) 'there was an error in the vote-counting programs or summation of ballot counts due to changed programs of some voter machines after publicly interrogating voter machines.'

2

"The verified statement of election contest did not state a remedy sought. Instead, it concluded: 'For the foregoing reasons, Contestant Firenza Pini alleges that mistake, error or misconduct has occurred in the counting of the ballots in the election which were so incorrectly counted as to change the result of the election, and, if counted, the number of legal votes cast for Contestant will exceed the number of legal votes for Defendant [Fenley] in said election.' " (*Pini v. Fenley* (2017) 9 Cal.App.5th 67, 70 (*Pini*).)

The trial court summarily dismissed the action on its own motion, determining that Pini filed the election contest after the five-day deadline to challenge a primary election. (Elec. Code, § 16421.)[1] We held that a nonpartisan primary election is transmuted into a general election where a candidate receives a majority of the votes and is elected to office. (*Pini, supra*, 9 Cal.App.5th at p. 72.) Therefore, the applicable deadline was 30 days under section 16401, subdivision (d). (*Pini, supra*, at p. 73.) We reversed and remanded for further proceedings. (*Id.* at p. 77.)

Beginning on November 19, 2018, Pini's election contest was tried to the court.

Pini called Richards as the first witness. On May 18, 2016, Richards participated in a voter registration drive at the fairgrounds in Hayfork where members of Hmong and Asian communities in District 5 were invited. There was a large turnout, hundreds came. The drive was to reach people in outlying areas, particularly people with language challenges, living in places where there were no telephones, addresses or even roads. Barbara and William Chadwick and Mike Wear delivered registration affidavits from the drive to Shyann Giddings at the county election office.

The only polling place in District 5 is in Hayfork. When Richards voted in the June 2016 primary election she requested but was not given a "privacy cover" for her

---

[1] All undesignated statutory references are to the Elections Code.

3

ballot. Precinct board members at the polling place in Hayfork could see how Richards voted.

As a candidate, Richards could only observe voting from a table 100 feet from the polling place and was not allowed in the polling place except to vote. Richards called Shanna White in the elections office to complain that some voters at the Hayfork polling place were being told they had to go the elections office in Weaverville to vote. Richards asked White if the polling place there would be open until 8:00 p.m. Richards was told it would close at 5:00 p.m. When Richards asked if ballots from people who want to vote between 5:00 and 8:00 p.m. would be accepted at Hayfork, White said she didn't know and told Richards not to call her anymore. Richards did not know if people told to go to Weaverville went to Weaverville.

Early on the day of the election Richards went to inspect the "zero count" on the voting machine and look at the seals, but she was told it had been done and the machine locked up the night before.[2] The zero test report (or "zero tape") for the machine at the Hayfork polling place for the presidential primary on June 7, 2016, indicated that the tape was printed on June 6, 2016, and the certification signed by one person. The zero tape showed zero votes counted for each candidate for elected office in precincts 311 and 501.

After the election, Richards saw copies of provisional ballots photocopied on 8 1/2 by 11 inch pieces of paper. The ballots bore the heading "Provisional Ballot."

Richards testified that a statement of votes cast in District 5 in the June 2016 election showed the number of registered voters reported to the state in certified election results was 1,488 but 1,357 voters were listed in the voter roll. Richards found only 60 of

---

[2] Precinct board members must examine "the counters [on voting machines] to see that each registers zero (000)" before voting begins. (§ 19360.) If the machine has printing capability, the board must run a " 'before election proofsheet' " to determine that all counters register zero. (*Ibid.*)

the 96 people registered at the Hayfork community event in the voter roll. Richards found 60 people by looking at the date the affidavit was signed as set forth in the voter rolls. Richards did not keep a list of the names of the 96 individuals whose affidavits were collected at the Hayfork event. Richards did not know why, if 36 individuals submitted affidavits, those affidavits were rejected.

Michael Wear testified that, during the June 2016 election, he was at the Hayfork polling place from 6:00 a.m. to 9:30 a.m. and from 6:00 p.m. to closing at 8:00 p.m. When voting, Wear asked where the voting booth was for handicapped and was told there wasn't one. He sat at a regular table with other people who were voting. There were voting booths at the polling place but none for the handicapped.

As an observer, Wear was seated 15 to 20 feet from where people were voting. Wear saw Hmong people at the opening of the polling place but did not see any of them vote. Wear heard White telling Hmong people they could not vote in Hayfork but had to drive to the central office about an hour away.

After the poll closed, Wear saw ballot boxes opened and the ballots put into bags, with the spoiled and unused ballots in separate bags. Wear told Michael Wyckoff, Sr., who was transporting the ballot containers and election materials to the central office, that Wear would follow him. Wyckoff said he was going to make stops along the way and stopped first at his home.

Wear observed the counting and processing of provisional ballots. He was 25 feet away so he could not see the signatures or addresses. White told Wear that 119 ballots, both provisional and vote-by-mail ballots, were not counted because they were not good. Wear saw provisional ballots being opened and information transferred to another piece of paper.

Pini testified that she visited the Post Mountain area of District 5 when she was running for office and also for voter registration.[3] The population there is 60 percent Hmong and the rest Caucasian. The area has no post office, gas station, supermarket, or commercial activities on the street that runs through the area. There are no public facilities besides the fire department. There are no street lights or paved roads or street addresses, only street signs.

On June 7, 2016, Pini voted at the Hayfork polling place. She was not offered a "privacy sleeve" for her ballot. When she went to pick up a privacy sleeve, a poll worker attempt to grab it back and held on for 10 seconds before letting Pini have it. Pini did not see other voters obtain a privacy sleeve. There were six voting booths set up. Not all voters used the booths. Those who were voting provisionally were sent to a table that had no privacy setups. Provisional voters were handed a piece of paper, not a ballot. There were four seats at the table. While Pini was at the polling place from 9:30 to 9:45 a.m. to mid-afternoon, there was a constant stream of people at the table.

Pini did not see any official translators at the polling place. She saw two or three Hmong community members offering to provide translation services. There was no county translator offering assistance.

Pini observed vote-by-mail processing for about an hour. She observed 574 absentee and vote-by-mail envelopes opened. She observed approximately 30 provisional ballots counted. Pini saw 662 vote-by-mail ballots counted versus 574 envelopes opened, a difference of 88 ballots with no corresponding envelope.

Kay Graves testified that she observed provisional ballots being read aloud to transfer the information to ballots that were run through the voting machine. The board would process ballots still in envelopes by opening the envelopes that had been approved,

---

[3] Richards is Pini's mother.

reading them aloud, filling in the official ballot, reading it again, and then running it through the machine. Graves asked to see signatures and envelopes of vote-by-mail ballots to make challenges but was told to submit challenges in writing and allowed only to sit and watch.

During canvassing, John Hamilton witnessed information being transferred from one ballot to another ballot when there was something wrong with the ballot. Hamilton saw White reject 79 provisional ballots. After canvassing, election materials were placed in plastic totes with folding lids, which were not sealed. Hamilton saw two supervisors and county staff members having a meeting in a basement conference room where election materials were secured and retained in the plastic totes. Hamilton saw a budget subcommittee meeting taking place in the room where the election materials were stored. Hamilton saw sealed vote-by-mail and provisional ballots being taken out of a basement conference room and not returned.

Diana Sheen served on the grand jury in Trinity County for three years. In year 2016-2017, there were complaints about the county elections office and the grand jury commenced an investigation. The grand jury stated a concern in its report that many people, department heads and authorities, had keys to the storage rooms where election materials were stored and made findings and recommendations about keys and who should have them.

Barbara Chadwick, a Trinity County supervisor elected in the June 2016 election to District 3, helped deliver 94 or 96 affidavits from the Hayfork voter registration drive to the county elections office. Chadwick was concerned about voter registration among the Hmong community. Chadwick did not attempt to review voter registration affidavits after the June 2016 election or obtain voter rolls to look into legalities.

William DeWolf served with Sheen on the grand jury in Trinity County and participated in the investigation of the county elections office. DeWolf was concerned that comparison of the signatures on absentee ballots and registration forms was not

7

overseen by the public. DeWolf asked questions about how voting machines were recalibrated, inspected, and set up to count votes. DeWolf requested access to the machines and was allowed to view them but not touch them.

Thomas Joseph Dennis Fox testified that Hmong people in the Post Mountain area live in shanties. Prior to the June 2016 election, Fox delivered 52 voter registrations forms for Hmong voters to the Secretary of State, rather than Trinity County, to make sure the votes got counted. Fox never got confirmation from the Secretary of State that these voters were registered in Trinity County.

After two days of testimony in November 2018, the trial was adjourned at Pini's request. The trial resumed for three days in January 2019.

At the continued trial, White, the clerk/recorder/assessor in Trinity County, testified she was hired in 2015 by the board of supervisors. The clerk functions as the registrar of voters as the county does not have a registrar.

White spoke to Tao Xiong and Xao Thao about serving as translators at the polls. White said they could not serve as translators because they were not certified. There was no certification in the Hmong language in Trinity County. White did not know if there was a state certification in the Hmong language but assumed there was. White could not herself determine if an individual was proficient in the Hmong language or the proficiency of that individual in translating accurately into English. If White authorized a translator to provide services on behalf of the county, that translator would represent the county. White would not allow a person she did not know to represent the county in that manner.

White testified regarding voter registration. Currently, after a voter has registered, a voter notification card would be sent to the voter confirming registration and stating the voter's address, precinct, and polling place. In 2016 White was not sending voter notification cards. If a registration affidavit was not complete, the voter would be contacted.

8

White testified regarding paper provisional ballots.  People who were not in the poll book would get a provisional ballot.  Provisional ballots were used throughout the county.  White did not know how many provisional ballots were printed or used.  Provisional ballots did not have any type of tint, watermark, or overprint.  A provisional ballot did not have a number on it.  A paper provisional ballot could not be processed in a voting machine, which guaranteed that the vote could not be counted until the voter's eligibility was determined.  Unused provisional ballots were destroyed.

When White started working in the clerk's office in 2010, it was the practice to issue provisional ballots.  White did not change the practice.  White set up the provisional ballots on her own initiative.  No member of the board of supervisors or the prior clerk/assessor/recorder authorized or directed White to print provisional ballots.

Provisional ballots were printed on photocopy paper, not card stock like an official ballot.  The text of provisional ballots was identical to the official ballots except that heading said "Provisional" versus "Official" ballot.  Provisional ballots were as close to the size of official ballots as possible but they did not have a stub like an official ballot.

If White determined that a voter using a provisional ballot was eligible to vote, the markings on the provisional ballot were transferred to an official ballot and processed in the voting machine like any other ballot.  Once approved to be counted, one person would read the provisional ballot, another person marked the official ballot, two different people would read the ballot again, and another person would double check the markings.  The stub on the official ballot would be pulled off and stapled to the paper ballot.  A provisional ballot transferred to an official ballot would be considered a vote-by-mail vote.  The official ballot would not be marked "duplicate."

Fenley testified.  Fenley was elected supervisor in 2012.  Fenley said he was familiar with the Hmong community in the Post Mountain area.  Infrastructure in Post Mountain includes some telephone, cell service, and possibly Internet.  There are dirt

9

roads and a fire department. Fenley has never had communications with the elections office about Hmong people in the Post Mountain area.

In the last four years, Fenley had a meeting at the fire hall in Post Mountain with 40 constituents from the Hmong community and some translators about compliance with California cannabis law. Fenley could not speak to them without a translator but afterwards quite a few came up and did speak English. Fenley felt he had a good, productive discussion.

In June 2016, Fenley learned that Chadwick and Richards had an event in Hayfork with members of the Hmong community. Two constituents approached him and were distraught that information was distributed promising that they could do anything they wanted regarding growing marijuana, things that the county and the state could not deliver. In the last couple years, Fenley has worked with a Hmong organization in the central valley to reach out to the Hmong community regarding behavioral health. Fenley was not aware of initiatives by the board of supervisors to engage non-English-speaking members of the Hmong community in the electoral process.

Fenley did not recall attending a meeting in May 2016 after the Hayfork community event with Jose Acosta, Fenley's spouse, and White about the upcoming election.

Thao Xiong, a resident of the Post Mountain area, testified that he registered to vote at a community event in 2016 and voted in the June 2016 election. He did not understand the full registration form and filled out the parts he understood. He received an envelope and form from the county, and, at the time to vote, he read the form, filled it out, put in the envelope, and put in the box at county fairgrounds. At the polling place, poll workers asked his name and found it in the poll book. Thao Xiong filled out some of the ballot form at home and some at the polling place. On the ballot form, Thao Xiong voted for the names he recognized. He voted at a table by himself. He saw other Hmong people vote at a table. He could not see how others were voting.

10

Chong Vue Xiong, a Hayfork resident, testified that he filled out a voter registration affidavit and went to the county fairgrounds to vote. Poll workers checked the list, did not find his name, and gave him a paper and an envelope. He filled out the paper and put it in the envelope. Chong Vue Xiong voted in a booth.

Chong Vue Xiong testified that he did not register to vote at the fairgrounds but received a registration application in the mail and returned it. He testified that poll workers found his name on the list and gave him a piece of paper which he marked and put in an envelope. He was not sure he voted in the January 2016 election but he did vote in the November 2016 election.

Kristi Swift, a Hayfork resident, testified that she registered to vote in the June 2016 primary election. She received a vote-by-mail ballot. She filled out the ballot and mailed it to the elections office. Swift called to check that her vote was received and White told Swift that her vote was not counted. White said that Swift's signature on the ballot did not match the signature on the voter registration card.

Martha Wofford testified that she lived in Hayfork. She did not recall registering to vote at a community event in Hayfork in May 2016. Wofford voted in the June 2016 primary election at the fairgrounds in Hayfork. Her name was not on the voter registration list. She received a paper ballot and filled it out. Wofford was told her vote was not counted. Wofford's signature image is in the "Voter Signature Image" space in the Trinity County poll book but the "Voter Signature" space is blank.

Timothy Joe Cummins testified that he lived in the Post Mountain area. Cummins did not go to the polling place in 2016 because he did not think he was going to be able to vote, based on his experience in 2014 when his provisional ballot was not counted.

On January 24, 2018, when Pini rested, Trinity County made an oral motion for nonsuit under Code of Civil Procedure section 581c. Fenley joined in the motion. After oral argument, the trial court took the motion under submission. The court added: "The Court is not inviting additional argument. Each side has made their positions quite clear.

11

[¶] If Counsel wants to cite any additional authority, the Court will allow that. The Court does believe there's been elections code violations or some poor policies, but that doesn't mean that the cause of action has been proven, or there's been proof that there would be a different result of the election."

On February 8, 2019, Fenley and Trinity County submitted additional authorities. Fenley noted that Code of Civil Procedure section 581c applies to jury trials and the equivalent motion for bench trials is a motion for judgment under Code of Civil Procedure section 631.8.

On February 22, 2019, Pini filed an opposition to the motion for judgment, a request to amend the election contest statement, and a 121-page document titled "Contestant's Law and Facts." On February 28, 2019, Pini filed a supplemental opposition, which was received but not filed. On March 4, 2019, Pini filed a "Submission of Proof Regarding False Testimony" to dispute the testimony of White and Fenley, accompanied by a video and transcript of a statement by Giddings, White's former assistant, as well as a first amended verified election contest statement. The same day the trial court issued a minute order declining to consider Pini's submission of proof regarding false testimony, reminding the parties that the court "only allowed briefing on questions of law . . . ."

On March 19, 2019, Pini filed a motion to reopen the case "to admit critical new evidence and previously suppressed testimony of witness Shyann Giddings . . . ."

On April 2, 2019, the trial court issued a ruling and statement of decision on the motion for judgment. The court granted the motion and ordered Fenley to prepare a judgment. The court also denied Pini's request to file an amended election contest statement and her motion to reopen the case.

In the statement of decision, the trial court enumerated "many areas of concern" testified to by Pini's witnesses regarding voting without secrecy, shortened hours the elections office was open for voting, irregularities in provisional votes, and restrictions on

12

voting observers. The court noted numerous irregularities related to provisional ballots "such as paper weight, watermark, lack of stub, lack of privacy sheaths, under ordering of official ballots, no logging of provisional ballots and failure to preserve unused provisional ballots." Also, voting observers were not able see vote-by-mail ballots and signatures, challenged signatures, or damaged/defective ballots. The court concluded, "[h]owever, technical violations in conducting, administering and processing the ballots are relevant, only if, illegal votes or suppressed votes were such that the outcome of the election would have been different."

The court concluded that Pini's evidence did not address the impact on the election result. As an example, the court cited the successful registration drive in the Hmong community and Wear's testimony that he saw Hmong at the Hayfork polling place but none voting, a circumstance which would be expected to lead to a review of voter registration affidavits to inquire into possible illegal vote suppression. All election materials had been delivered to the court but Pini never presented any in evidence, "arguably the most valuable evidence that could be presented." Accordingly, the court applied Evidence Code section 412, which provides that where a party presents weaker evidence when it had the power to present stronger evidence, the weaker evidence should be viewed with distrust.

On April 10, 2019, the trial court issued an order filing Pini's supplemental opposition nunc pro tunc on February 28, 2019, vacating the order to Fenley to prepare a judgment, and requiring Fenley to file any supplemental briefing by April 26, 2019. The court stated that it would not consider any evidence submitted posttrial or any declaration or briefing other than allowed by the order but would amend its ruling to address issues resulting from the parties' supplemental briefs.

On April 26, 2019, Fenley filed objections to Pini's supplement opposition incorporating his previous objections.

On May 2, 2019, the trial court issued a ruling granting the motion for judgment. The court observed, "[t]he Supplemental Opposition suggests that, then, recently 'registered' Hmong citizens were not allowed to vote in the June 7, 2016 election. Once again, Contestant is drawing assumptions when it had been with her power to have the registration affidavits introduced into evidence and to conduct a review of the affidavits to determine if the applicants were qualified to be registered and to ascertain if the affidavits had been processed lawfully, in a timely manner." The court concluded: "The Contestant has failed to meet the burden of proof to establish by clear and convincing evidence that illegalities and misconduct in the election occurred and that those acts would have changed the outcome of the election."

## DISCUSSION

### *Pini's Opening Brief*

As an initial matter, we address the many deficiencies in Pini's opening brief.

Pini has failed to provide a statement of facts in her opening brief in conformance with California Rules of Court, rule 8.204(a)(2)(C), which requires "a summary of the significant facts limited to matters in the record." (*Silva v. See's Candy Shops, Inc.* (2016) 7 Cal.App.5th 235, 260.) She has made no effort to fairly summarize the evidence presented. (*Ibid.*; Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2020) ¶ 9:27 ["your brief should *accurately and fairly* state the critical facts (including the evidence), free of bias"].) Pini's version of the facts is entirely one-sided. She simply ignores evidence that does not support her position. (*In re Marriage of Davenport* (2011) 194 Cal.App.4th 1507, 1530-1531 (*Davenport*) [appellant "proceeds to recite the evidence in a fashion favorable to her" as though the statement of decision did not exist; "[s]uch conduct is not to be condoned"].) Examination of the evidence cited in some instances reveals outright distortion of the facts. (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs, *supra*, ¶ 9:141 ["the statement of facts should not be presented in a manner that *misleads, misrepresents* or *distorts* the facts"].)

14

In addition, some facts are stated without citation to evidence in the record. "Statements of fact that are not supported by references to the record are disregarded by the reviewing court." (*McOwen v. Grossman* (2007) 153 Cal.App.4th 937, 947; *Fierro v. Landry's Restaurant Inc.* (2019) 32 Cal.App.5th 276, 281, fn. 5.)[4] This principle extends to any portion of an appellate brief, including argument. (*Alki Partners, LP v. DB Fund Services, LLC* (2016) 4 Cal.App.5th 574, 590, fn. 8 (*Alki Partners*) [record citations included in statement of facts do not cure failing to include record citations in argument portion of brief], citing *City of Lincoln v. Barringer* (2002) 102 Cal.App.4th 1211, 1239, fn. 16 (*Barringer*).) Further, many of the factual statements impermissibly cite as support Pini's memoranda of points and authorities or argument of counsel at trial. (*Alki Partners, supra*, at p. 590 ["Matters set forth in points and authorities are not evidence"]; *York v. City of Los Angeles* (2019) 33 Cal.App.5th 1178, 1191 ["Most of plaintiffs' citations are to the assertions of their attorneys, which are *argument*, not evidence"].)

Pini also cites evidence without any indication that the trial court sustained objections to and struck the trial testimony referenced, or that referenced trial exhibits were never admitted as evidence. In one instance, Pini expressly acknowledges that an objection was sustained to the testimony cited, indicating that her reliance on evidence not admitted at trial is deliberate. Pini does not challenge the court's evidentiary rulings on appeal.

Lastly, Pini's statement of facts is essentially argument, asserting that facts and evidence establish violations of the Elections Code, the federal Voting Rights Act and state and federal Constitutions. "Outright argument on the various issues should be

---

[4] Adding to the court's burden in determining the relevant facts, when Pini does reference the clerk's or reporter's transcript, she does not include the volume. (Cal. Rules of Court, rule 8.204(a)(1)(C) [each brief must "[s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears"].)

reserved for the discussion portion of the brief.  Your statement of facts should basically be neutral in tone, giving an *honest and fair* picture of the pertinent facts." (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs, *supra*, ¶ 9:140.)  An appellant's attempt to "merely reargue the 'facts' as she would have them . . . [Citations.] . . . manifests a treatment of the record that disregards the most fundamental rules of appellate review. [Citation.]" (*Davenport, supra*, 194 Cal.App.4th at p. 1531.)  "[S]uch 'factual presentation is but an attempt to reargue on appeal those factual issues decided adversely to it at the trial level, contrary to established precepts of appellate review.  As such it is doomed to fail.' [Citation.]" (*Ibid.*)

*Contempt of Court Referral*

We deem more serious a multi-page, single-spaced section of the statement of facts in which Pini and her appellate counsel accuse trial judges assigned to this case of bias.[5]  We conclude that these accusations cross the line into contempt of court.

Without citation to the record, Pini and her counsel accuse the judge who originally dismissed the case of "further[ing] her own interests rather than the interest of justice" and proceed to describe a disciplinary complaint about financial misconduct Pini made against the judge.

Pini and her counsel then attack the judge who presided over the trial and rendered the decision from which Pini appeals.  The judge is accused of bias—again unsupported by any citation to the record—stemming from her husband's financial interest in a rail project proposal in the county and Fenley's position on a board considering the proposal. Pini and her counsel admit that this court denied her writ petition contending that the judge should have recused herself in a related case brought by Pini against Trinity County

---

[5]  Entire sections of Pini's opening brief are single-spaced in violation of California Rules of Court, rule 8.204(b)(5), which requires that lines of text in an appellate brief be "at least one-and-a-half spaced."

and its board of supervisors.  Without identifying any conduct in the trial proceedings evincing bias, Pini's reply brief declares:  "The court's bias was so thick it could be cut with a knife."**6**

As this court cautioned in *In re S.C.* (2006) 138 Cal.App.4th 396:  "Disparaging the trial judge is a tactic that is not taken lightly by a reviewing court.  Counsel better make sure he or she has the facts right before venturing into such dangerous territory because it is contemptuous for an attorney to make the unsupported assertion that the judge was 'act[ing] out of bias toward a party.' "  (*Id.* at p. 422, quoting *In re White* (2004) 121 Cal.App.4th 1453, 1478.)  Lacking any foundation, an accusation that the trial judge was biased "appears to constitute contempt of court."  (*In re S.C., supra*, at p. 424.) We will not institute contempt proceedings but will leave it to the State Bar of California to address.  (*Ibid.*)

*Motion for Judgment*

Pini contends that, contrary to the court's rulings on the motion for judgment, "the evidence was overwhelming on . . . numerous Elections Code violations, such that the June 7, 2016 election for the Supervisor in District 5 of Trinity County would have necessarily impacted the election outcome."

The principles applicable to review of an election contest case are familiar.  "The purpose of an election contest is 'to ascertain the will of the people at the polls, fairly, honestly and legally expressed.'  [Citation.]"  (*Friends of Sierra Madre v. City of Sierra Madre* (2001) 25 Cal.4th 165, 192 (*Friends of Sierra Madre*).)  " ' "It is a primary principle of law as applied to election contests that it is the duty of the court to validate

---

**6** "The mere fact that the trial court issued rulings adverse to [the appellant] on several matters in this case, even assuming one or more of those rulings were erroneous, does not indicate an appearance of bias, much less demonstrate actual bias."  (*Brown v. American Bicycle Group, LLC* (2014) 224 Cal.App.4th 665, 674, citing *Blakemore v. Superior Court* (2005) 129 Cal.App.4th 36, 59-60.)

the election if possible.  That is to say, the election must be held valid unless plainly illegal." ' [Citation.]  The contestant has the burden of proving a defect in the election by clear and convincing evidence.  [Citation.]  We are bound by the trial court's determination of the facts except to the extent that they are not supported by substantial evidence.  [Citation.]  The evidence must be considered in the light most favorable to the prevailing party giving such party the benefit of every reasonable inference, and resolving all conflicts in favor of the judgment.  [Citation.]"  (*Clark v. McCann* (2015) 243 Cal.App.4th 910, 915 (*Clark*).)

The general rule is "that an election must be held valid where technical errors or irregularities did not affect the result . . . ."  (*Salazar v. City of Montebello* (1987) 190 Cal.App.3d 953, 958-959 (*Salazar*); see also *Gooch v. Hendrix* (1993) 5 Cal.4th 266, 278 (*Gooch*); *Canales v. City of Alviso* (1970) 3 Cal.3d 118, 127; *Nguyen v. Nguyen* (2008) 158 Cal.App.4th 1636, 1662-1663 (*Nguyen*) ["Where technical deviations from Elections Code provisions have not posed the possibility of an actual change of result, the courts have uniformly upheld the results of the election as against any challenges based on those technical deviations"].)  A number of provisions of the Elections Code expressly prohibit setting aside an election without proof that the result would have been different in the absence of the deviation.  For example, section 16204 provides that "[a]n election shall not be set aside on account of eligible voters being denied the right to vote, unless it appears that a sufficient number of voters were denied the right to vote as to change the result."  (See also §§ 16201, 16202, 16203, 16402.5.)

The court's authority to invalidate an election is limited to the grounds specified in section 16100.  (*Friends of Sierra Madre, supra*, 25 Cal.4th at p. 192; *McKinney v. Superior Court* (2004) 124 Cal.App.4th 951, 958; *Cummings v. Stanley* (2009) 177 Cal.App.4th 493, 501.)  These are malconduct of a precinct board member, the elected person being ineligible for office, bribery or other offense against the elective franchise, illegal votes being cast, denial of eligible voters' right to vote, precinct board

18

errors in conducting the election or canvassing election returns, and error in voting counting programs or summations. (§ 16100, subds. (a)-(g).)[7]

This case comes to us from a grant of a motion for judgment under Code of Civil Procedure 631.8, subdivision (a). "The purpose of a motion for judgment is to allow the trial court to dispense with the need for a defendant to produce evidence when, after weighing the evidence at the close of the plaintiff's case, it is persuaded that the plaintiff has failed to sustain its burden of proof. [Citation.] In weighing the evidence on a motion for judgment at the close of the plaintiff's case, the trial court may exercise its prerogatives as a fact finder by refusing to believe witnesses and by drawing conclusions at odds with expert opinion. [Citations.]" (*Kirk Corp. v. First American Title Co.* (1990) 220 Cal.App.3d 785, 806 (*Kirk Corp.*).)

"In reviewing a judgment granted in favor of defendant after the plaintiff has completed its presentation of evidence in a court trial, the evidence is viewed most favorably to the defendant and the judgment must be supported by substantial evidence. [Citation.] The function of the reviewing court is to determine whether the judgment is supported by any competent and substantial evidence. [Citations.] The trial court's findings in granting a motion for judgment are entitled to the same respect on appeal as any other findings and are not reversible if supported by substantial evidence. [Citation.] When two or more inferences can be reasonably deduced from the evidence, the reviewing court is without power to substitute its deduction for those of the trial court. [Citation.]" (*Kirk Corp., supra*, 220 Cal.App.3d at p. 806.)

---

[7] "[T]he word 'malconduct' " as used in statutes governing election contests includes "erroneous conduct without wrongful intention," and is sufficient to support an election contest where the candidate not receiving the highest number of votes is declared the winner. (*In re Cryer* (1926) 77 Cal.App. 605, 609.)

*Hmong Community*:  Pini begins her argument that the motion for judgment was wrongly decided with a number of contentions concerning voters in the Hmong community.[8]

First, Pini argues that the court erred in determining that Pini offered no proof that the 96 affidavits collected at the Hayfork registration event were not legally processed, which caused Richards to receive fewer votes.  Pini cites section 2102, which provides in relevant part that "[a] *properly executed* affidavit of registration shall be deemed effective upon receipt of the affidavit by the county elections official if received on or before the 15th day before an election to be held in the registrant's district."  (§ 2102, subd. (a), italics added.)

Richards testified that her examination of the voter rolls indicated only 60 out of 96 affidavits collected at the Hayfork event were processed.  However, Richards did not know why the 36 affidavits were not processed.  She did not know the names of the individuals whose affidavits she believed were not processed.  Richards could only speculate that any of these 36 individuals would have voted for her.  (*Salazar, supra*, 190 Cal.App.3d at p. 960 [speculation regarding votes that went to other candidate did not prove election result was actually affected].)  Pini also cites Fox's testimony that he delivered 52 voter registration affidavits to the Secretary of State without acknowledging

---

[8]  We disregard Pini's contentions that (1) "the Trinity County poll book as of June 6, 2016 (the day before the election) reflected only a dozen Asian names," and (2) "though there is testimony among Hmong voters voting or attempting to vote all day long, on election day of June 7, 2016, there is no record of any Hmong votes at the poll (the polling place at Hayfork fairgrounds)."  These contentions are supported only by citations to Pini's posttrial briefing, which is not evidence.  (*Alki Partners, supra*, 4 Cal.App.5th at p. 590.)  We also disregard Pini's contention that "[m]ost of the Hmong were turned away," which is not supported by any citation to the record.  (*Barringer, supra*, 102 Cal.App.4th at p. 1239; *Alki Partners, supra*, 4 Cal.App.5th at p. 590, fn. 8.)

that section 2102 mandates that "[t]he affidavit of registration shall be mailed or delivered to the *county elections official* . . . ." (§ 2102, subd. (a), italics added.)

Next Pini faults White for directing voters not on the Hayfork poll list to come to the elections office in Weaverville to cast a provisional ballot, and "causing a physical and financial hardship for the Hmong which resulted in a majority of Hmong voters leaving the polling place and going home, having never voted." Pini cites the testimony of Richards that she saw some voters told to go to Weaverville, although Richards did not identify those voters as Hmong voters, and, more significantly, Wear, who testified he heard Hmong voters told to go Weaverville and did not see any Hmong vote on election day at the Hayfork polling place.

As the trial court found regarding this testimony, "there was no evidence that these were registered voters." There was also no evidence that voters from the Hmong community told to go to Weaverville gave up and did not vote, as Pini claims. Richards admitted she did not know if voters told to go to Weaverville to vote did go there. That Wear did not see voters he identified as Hmong voting at Hayfork does not prove that these voters did not vote at Weaverville. Even crediting Pini's speculation that registered Hmong voters told to vote at Weaverville went home instead, this does not prove that they would have voted for Richards in a sufficient number to change the outcome of the election. (§§ 16204, 16402.5; see also *Salazar, supra*, 190 Cal.App.3d at p. 960.)[9]

Pini notes that White testified that the county had not conducted "voter registration drives directed to the Hmong people" during her tenure. Pini cites section 2103, which states the Legislature's intent "that county elections officials, in order to promote and

---

[9] We disregard Pini's related claim that Hmong voters who appeared at the Hayfork polling place were required to cast provisional ballots which were not counted. This claim is devoid of any reference to evidence presented at trial. (*Barringer, supra*, 102 Cal.App.4th at p. 1239; *Alki Partners, supra*, 4 Cal.App.5th at p. 590, fn. 8.)

encourage voter registrations, shall enlist the support and cooperation of interested citizens and organizations in such a way as to reach most effectively every resident in the county" (§ 2103, subd. (b)), and that "non-English-speaking citizens, like all other citizens, should be encouraged to vote" (§ 2103, subd. (c)). The trial court agreed that "inclusivity and participation" has "not been a governmental priority in Trinity County" and that "community activists were the moving force in the 5th district precinct registration drive and in providing voter assistance." However, the trial court concluded that Pini failed to provide evidence that the outcome of the election would have been different had White and the county engaged in voter outreach among non-English-speaking Hmong voters. Pini offers no contrary evidence.

Pini next argues that "there were no translators to provide assistance to any Hmong who attempted to vote at the Hayfork polling place (despite volunteers who offered translations services)." Pini asserts that the failure to provide translators was a violation of section 12303, subdivision (c), which provides that election officials must make reasonable efforts to recruit election officials fluent in a language used by non-English-speaking citizens, if "3 percent or more of the voting-age residents of a precinct, or if interested citizens or organizations provided information that the election official believes indicates a need for voting assistance" for such citizens.

The trial court found: "Trinity County was not required to provide election materials in the Hmong language and post those translations at polling places nor make good faith efforts to recruit bilingual poll workers. Election Code section 14201(d) requires the Secretary of State to determine the precincts that have '3% or more of the voting age residents that are members of a single language minority and lacks sufficient skills in English to vote without assistance.' This percentage is recalculated every Gubernatorial election relying on general election precinct reports and the latest U.S. Census. Trinity County had no legal obligation because no single language minority reached the 3% mark."

Pini states that "[c]ensus information, relied on by the trial court, while informative is not controlling here." The question before us is whether substantial evidence supports the trial court's finding, not that it be "controlling" evidence, and Pini's grudging acknowledgement that such evidence is "informative" constitutes tacit agreement that this finding is supported by substantial evidence.

Pini, nonetheless, maintains that the "interested citizens or organizations" provision of section 12303, subdivision (c)(1), required recruiting election officials fluent in the Hmong language based on the 96 affidavits collected in May 2016 at the Hayfork fairgrounds. But Pini presented no evidence that individuals whose affidavits were collected were non-English-speaking citizens or, more significantly, that the failure to recruit Hmong translators cost Richards the election. To the contrary, the only trial testimony Pini cites to support her contention that "Trinity County elections officials participated in the systematic exclusion of Hmong voters and facilitated the rejection of their affidavits of registration and consequently their efforts to vote" was from Chong Vue Xiong. Chong Vue Xiong's testimony was that he did not register at the Hayfork event and was not sure he voted in the June 2016 election.

*Provisional Votes*: Pini asserts the court erred in granting the motion for judgment because illegal provisional votes were cast to give Fenley the victory, provisional votes did not conform to the Elections Code, and provisional ballots given to Hmong voters were not counted.

Pini argues that the provisional ballots were illegal because they were printed on photocopy paper instead of card stock, "were not on display at the polling place," "were secreted and removed from the public observation room," and "there was no record of how many were created, distributed, voted and returned and additionally admittedly surplus were destroyed." Pini declares that "[t]his scheme and artifice of Ms. White allowed her to dispose of votes without a trace."

23

The trial court stated that "if [Fenley] benefited from illegal votes" the court would set aside the election, but found "there is no proof of illegal votes cast. Specifically, the Court does not find that the provisional ballot cast to be illegal votes." The court noted discussion at trial of "[n]umerous irregularities . . . such as paper weight, watermark, lack of stub, lack of privacy sheaths, under ordering of official ballots, no logging of provisional ballots and failure to preserve unused provisional ballots." The trial court concluded that "technical violations in conducting, administering, and processing ballots are relevant, only if, illegal votes or suppressed votes were such that the outcome of the election would have been different." "While Contestant, in her arguments, presents a scathing review of the Trinity County Election Office, the evidence does not address the impact on the election."

Pini's challenge to provisional votes largely boils down to the contention that they were illegal because they violated section 13202 ballot printing requirements regarding size, quality and tint of paper, kind of type, and ink. However, in *Rideout v. City of Los Angeles* (1921) 185 Cal. 426, the California Supreme Court observed that "violations of statutes prescribing the dimensions of the ballots and the character of type and color of ink to be used in printing them do not, in themselves, render the election void . . . ." (*Id.* at p. 431; *Nguyen, supra*, 158 Cal.App.4th at pp. 1662-1663 ["Where technical deviations from Elections Code provisions have not posed the possibility of an actual change of result, the courts have uniformly upheld the results of the election as against any challenges based on those technical deviations," citing, inter alia, *Rideout*].) Pini presented no evidence that any violation of section 13202 changed the outcome of the supervisorial election.

Pini further accuses White of "resort[ing] to ballot stuffing" to "give Fenley the win" using "excess vote by mail ballots she conveniently had in her office. To wit, exactly 88 of them that had no matching envelopes." Pini correctly points out that illegal voting affecting an election outcome may be proved with circumstantial evidence.

(*Gooch, supra*, 5 Cal.4th at pp. 284-285.) Circumstantial evidence is indirect evidence from which a logical and reasonable factual inference may be made. (CACI No. 202; CALJIC. No. 2.00; Evid. Code, § 600, subd. (b).) It is neither logical nor reasonable to infer that White created false absentee and vote-by-mail ballots and counted them in full view of public observers simply because Pini did not see the envelopes in which they were originally contained.

Moreover, in an election contest, " '[i]t is presumed that official duty has been regularly performed.' " (*Bridgeman v. McPherson* (2006) 141 Cal.App.4th 277, 287, quoting Evid. Code, § 664.) Evidence that Pini saw 88 absentee or vote-by-mail ballots without envelopes counted does not overcome the presumption that valid vote-by-mail ballots were properly counted by Trinity County elections officials.

Finally, Pini's contention that provisional ballots given to eligible Hmong voters were not counted is based on speculation that "Trinity County's policy concerning the acceptable form of addresses on voter registration applications prevented eligible voters from voting." However, Pini concedes there is no evidence that registration applications were rejected on this basis, arguing only that: "If the registration difficulty had to do with proofs of residency, a fixed property address is only one proof of residency." Pini has presented no evidence, that if such rejection occurred, the number of ballots involved were sufficient to change the outcome of the election. (§§ 16204, 16402.5.)

*Voting Tallies Not Reconciled*: Pini claims that White provided reports to the Secretary of State under section 2187 that "do not reconcile."[10] Section 2187 requires a county election official at various intervals before primary and general elections to inform the Secretary of State of the total number of voters in the county, total number of voters registered with political parties or nonpartisan, and the total number of voters by

---

[10] Pini improperly cites her posttrial brief and a number of trial exhibits which were never admitted as evidence supporting this contention.

party preference in each supervisorial, congressional, senate, assembly, and board of equalization district, as well as in cities and unincorporated areas. (§ 2187, subds. (a), (c).)

In *Young v. Gnoss* (1972) 7 Cal.3d 18, the California Supreme Court observed that the purpose of statutes that direct "the county clerk to furnish lists of registered voters and affidavit information to the Secretary of State and to political parties within a specified number of days before the election" is " 'merely to provide general election information.' " (*Id.* at pp. 24-25, quoting *Silver v. Brown* (1965) 63 Cal.2d 270, 277.) These statutes are not a tool to audit elections. To the contrary, the court said that inability to comply with such statutes would not " 'interfere with the orderly conduct of the primary and general elections.' " (*Young, supra*, at p. 25; *Silver, supra*, at p. 277.)

*Precinct and Canvass Boards*: Pini contends that the motion for judgment should not have been granted because precinct and canvass boards violated the Elections Code. Pini lists a numbered series of claimed violations regarding record reconciliation, voter secrecy, volunteer translators, failure to administer oaths to poll workers, initiation of the voting machine the night before the election, certification of the zero tape by only one poll worker at Hayfork, directing provisional voters to Weaverville, not transporting ballots directly from Hayfork to the elections office after the poll closed, and issues related to Hmong voters.

A list of complaints is not a cognizable legal argument regarding why or how the trial court erred in granting the motion for judgment. "[T]he trial court's judgment is presumed to be correct, and the appellant has the burden to prove otherwise by presenting legal authority on each point made and factual analysis, supported by appropriate citations to the material facts in the record; otherwise, the argument may be deemed forfeited. [Citations.] [¶] It is the appellant's responsibility to support claims of error with citation and authority; this court is not obligated to perform that function on the appellant's behalf." (*Keyes v. Bowen* (2010) 189 Cal.App.4th 647, 655-656.) "Matters

26

not properly raised or that are lacking in adequate legal discussion will be deemed forfeited." (*Okorie v. Los Angeles Unified School Dist.* (2017) 14 Cal.App.5th 574, 600 (*Okorie*); *Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 52 ["We are not required to examine undeveloped claims or to supply arguments for the litigants"]; *Landry v. Berryessa Union School Dist.* (1995) 39 Cal.App.4th 691, 699-700 (*Landry*) ["When an issue is unsupported by pertinent or cognizable legal argument it may be deemed abandoned and discussion by the reviewing court is unnecessary"].)

We therefore disregard these claims of error.

*Corruption*: Pini finishes with the contention that Fenley benefited from corrupt practices. (§ 16100, subd. (c).)[11] This argument is devoid of citations to the record and we would be justified in disregarding it on that basis alone. (*Barringer, supra*, 102 Cal.App.4th at p. 1239; *Alki Partners, supra*, 4 Cal.App.5th 574, 590, fn. 8.)

Further, Pini's election contest statement did not allege corruption on the part of Fenley. (*Pini, supra*, 9 Cal.App.5th at p. 70.) During cross-examination, Pini confirmed that, on August 6, 2018—two years after filing this case—she signed a verification of a complaint in a related case seeking injunctive relief filed against Trinity County and its board of supervisors, including Fenley. Pini confirmed that the complaint stated that " '[t]he verified statement of election contest contains no allegation of wrongdoing by Fenley,' " and that " '[h]e is named merely to identify him as the person whose election is being contested consistent with Elections Code Section 16002.' " Pini testified that the

---

[11] Section 16100, subdivision (c) provides that an elector may contest an election on the ground "[t]hat the defendant [here, Fenley] has given to any elector or member of a precinct board any bribe or reward, or has offered any bribe or reward for the purpose of procuring his election, or has committed any other offense against the elective franchise defined in Division 18 (commencing with Section 18000 [setting forth election law violations punishable by criminal penalties])." Section 16002 provides in relevant part: "When used in this division . . . . 'Defendant' means that person whose election or nomination is contested . . . ."

statement—made two years after she filed this case—was true at the time "but I have since then come into information that invalidates that statement."

Pini's argues that Fenley, as a supervisor, was notified of but failed to address malconduct by White. Pini asserts that "Fenley may have participated in this malconduct or benefitted from the malconduct" or "might have authorized this malconduct, directly or indirectly." Pini notes Fenley was one of the supervisors who hired White and argues that he controlled the money which funded the elections office, including White's salary and benefits. This is patently nothing but speculation and innuendo.

We conclude the trial court did not err in granting the motion for judgment.

*Motion to Reopen to Admit Additional Evidence*

Pini contends "the trial court abused its discretion when it denied the motion to reopen the case to admit additional testimony."[12]

"Trial courts have broad discretion in deciding whether to reopen the evidence. [Citation.] We review a court's denial of a motion to reopen the evidence for an abuse of discretion. [Citation.] The appropriate test for abuse of discretion is whether the trial court's decision exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, we have no authority to substitute our decision for that of the trial court. [Citation.]" (*Horning v. Shilberg* (2005) 130 Cal.App.4th 197, 208-209 (*Horning*).) While trial courts have broad discretion in ruling on a motion to reopen the evidence, "that discretion must be exercised reasonably." (*Monroy v. City of Los Angeles* (2008) 164 Cal.App.4th 248, 265.)

---

[12] In this portion of her opening brief, Pini contends that the trial court also abused its discretion in denying her request to submit an amended election contest statement. Pini cites general authority regarding the right to amend. However, Pini presents no argument or authority as to why the court abused its discretion. We conclude that Pini has abandoned the issue. (*Okorie, supra*, 14 Cal.App.5th at pp. 599-600; *Landry, supra*, 39 Cal.App.4th at pp. 699-700.)

28

Fenley argues that "[i]n election contests, the trial court cannot entertain post-judgment motions because the exclusive remedy is within the court of appeal." Fenley cites *Packard v. Craig* (1896) 114 Cal. 95, which held that elections statutes do not authorize a postjudgment motion for new trial and the remedy of a party dissatisfied with the judgment is by appeal only. (*Id.* at pp. 97-98; see also *People v. Bank of San Luis Obispo* (1907) 152 Cal. 261, 270-271; § 16900.)

The argument fails because Pini filed a motion to reopen the case before the trial court entered judgment. Pini filed the motion on March 19, 2019. The trial court did not issue its initial ruling on the motion for judgment until April 2, 2019, in which it denied the motion to reopen and ordered Fenley to prepare a judgment. On April 10, 2019, the court vacated the order to prepare a judgment and indicated it would amend its prior ruling to address Pini's supplemental opposition and any supplemental briefing from Fenley. On May 2, 2019, the court issued a ruling on the motion for judgment and again ordered Fenley to prepare judgment. On May 20, 2019, the trial court entered judgment for Fenley. Accordingly, Fenley's authorities prohibiting postjudgment motions in election contest cases are inapposite.

The more apposite authority is *Lord v. Dunster* (1889) 79 Cal. 477 (*Lord*), involving an election contest for sheriff of Nevada County. Lord filed a contest contending that precinct boards committed malconduct in counting votes for Dunster that were actually cast for Lord. (*Id.* at p. 482.) The trial court directed a recount that resulted in a dramatic increase in the number of votes cast for Lord in one precinct, sufficient to give him a majority in the county. (*Id.* at p. 486.)

The trial concluded on a Saturday and on the following Monday Dunster made a motion to continue the trial and reopen the case. (*Lord, supra*, 79 Cal. at pp. 483, 486.) Dunster supported his motion with an affidavit from three election board members attesting to the surprise of citizens of the precinct at the result of the recount and their desire to ascertain who had committed fraud. (*Id.* at p. 487.) Attached to the affidavit

was a certificate signed by more than a hundred voters in the precinct attesting to having voted for Dunster, a number which would be sufficient to give Dunster a majority. (*Ibid*.) The affidavit stated that with more time more signatures could be obtained and all voters signing the certificate were prepared to testify at trial. (*Ibid.*) The trial court denied the motion to reopen. (*Id.* at p. 483.)

The California Supreme Court held that the lower court "erred in denying the motion for continuance made on the opening of court Monday morning, and before a decision was made in the case." (*Lord, supra*, 79 Cal. at p. 486.) The court held "[t]he showing was so strong we think the court abused its discretion in refusing a continuance." (*Id.* at p. 487.) "It was made clear to the court that some one [*sic*] had committed a gross fraud. Either the officers of election had been guilty of conspiring together to defeat the will of the people, or a correct canvass of the votes had been falsified by a felonious tampering with the ballots which were returned to the county clerk." (*Id*. at p. 488.)

Here, the testimony Pini sought to provide was from Giddings. Pini's offer of proof consisted of a DVD and informal transcription of an interview of Giddings by Wear, which he provided to Pini's counsel in February 2019. Pini offered that Giddings would testify to a number of facts, in particular that Fenley and his partner Acosta came in often for meetings with White during the June 2016 election cycle, and, after a visit from Fenley and Acosta, White took over the voter registration process from Giddings, asking for Hmong registration affidavits and others from District 5. Pini argued in the moving papers that the "credible testimony by Shyann Giddings of things she witnessed in the course of her work shows perjury by not only Shanna White but also John Fenley both of whom testified that either they never met in the elections office prior to the election according to Shanna White or in the case of Mr. Fenley that he does not remember if he did so. Ms. Giddings states that she saw not only Mr. Fenley and also his mate Jose Acosta meeting with Shanna White on several occasions. As such this

30

testimony is crucial to the fundamental issues of the case best taken by direct testimony Ms. Giddings is seeking to provide in person."

Giddings' testimony, however, did not constitute a "strong showing" that fraud or malconduct served to change the result of the election. Pini endeavored to raise a suspicion that White and Fenley testified falsely regarding their meetings during the June 2016 election cycle to conceal their purpose to suppress votes of members of the Hmong community in District 5. However, Pini's burden was to prove that vote suppression altered the outcome of the election. (§§ 16204, 16402.5.) As the trial judge pointed out, Pini failed to review direct evidence in the form of voter registration affidavits for that purpose. Instead, Pini sought to present evidence of what amounted to a conspiracy theory, which the court justifiably viewed with skepticism. (Evid. Code, § 412.)

In addition, the trial court's stated reasons for denying the motion to reopen focused on Pini's lack of diligence. The trial court ruled: "Trial commenced on November 19, 2018. The next day the trial was adjourned at Contestant's request. Trial reconvened on January 22, 2019. Shyann Giddings' participation in the June 2016 election process was known by all parties prior to trial. Declarant Michael Wear testified at trial and was present through most of the proceedings. Contestant had ample opportunity to interview Ms. Giddings and to subpoena her. While Contestant may not have known the full scope of her testimony, Contestant was aware that Giddings was in a position to witness parts of the alleged misconduct and non-compliance with some Election[s] Code violations."

The court in *Lord* noted the diligence of the affiants in obtaining more than a hundred signatures of electors between Saturday afternoon and Monday morning. (*Lord, supra*, 79 Cal. at p. 488.) "It is recognized that the party seeking to reopen the case must show that he has been diligent and that the evidence could not have been produced earlier." (*People ex rel. Dept. of Pub. Wks. v. McCoy* (1967) 248 Cal.App.2d 27, 30; see also *Broden v. Marin Humane Society* (1999) 70 Cal.App.4th 1212, 1222 ["A motion to

reopen is also subject to a diligence requirement"]; *Horning, supra*, 130 Cal.App.4th at p. 209.) "[A] trial court may properly refuse to reopen a case for introduction of further testimony, or other additional evidence, where there has not been a sufficient showing of any excuse for not having produced the evidence at trial [citation], or where there is no showing of diligence. [Citation.]" (*Estate of Horman* (1968) 265 Cal.App.2d 796, 807.)

Pini acknowledged that "sometime" after the June 2016 election Giddings recorded the interview with Wear that was the basis of the motion to reopen. Yet Wear, who was a witness for Pini at trial, did not provide the recording to Pini's counsel until February 28, 2019, more than a month after the trial concluded. Pini's counsel declared that, notwithstanding Giddings' willingness to submit to a recorded interview, eight attempts were made to serve Giddings with a subpoena without success, even though Giddings lived a block from the courthouse. Despite Giddings' success in avoiding service of a subpoena, Pini maintained that Giddings was now prepared to testify. Pini's showing of diligence was at best contradictory and the trial court plainly did not credit it. We have no authority to substitute our decision for the trial court's. (*Horning, supra*, 130 Cal.App.4th at pp. 208-209.)

### *Trinity County Appearing as a Real Party in Interest*

At the commencement of trial, Pini objected to the appearance of Trinity County as "not a party to the proceeding" and counsel for Trinity County as "not representing a party to the proceeding." The trial court overruled the objection.

Pini contends the trial court abused its discretion in permitting Trinity County to participate in the litigation as a party without filing a motion to intervene under Code of Civil Procedure section 387. Pini argues that "Trinity County referred to itself as representing the elections officer, but no motion or pleading was filed to change that status to 'real party in interest.' "

" ' "Real party in interest" has been generally defined as "any person or entity whose interest will be directly affected by the proceeding . . . ." ' " (*Connerly v. State*

32

*Personnel Bd.* (2006) 37 Cal.4th 1169, 1178, quoting *Sonoma County Nuclear Free Zone '86 v. Superior Court* (1987) 189 Cal.App.3d 167, 173.)

In an election contest, both the governmental entity and its officials conducting the election, as well as the winning and losing candidates, have an interest directly affected by the proceeding. A candidate has an obvious interest affected by the court's determination of the outcome of the election. (*Faulder v. Mendocino County Bd. of Supervisors* (2006) 144 Cal.App.4th 1362, 1369.) A county has an interest in the regularity of election procedures and the performance of its election officials, also directly affected by an election contest outcome. That interest is highlighted in this instance by Pini's election contest statement alleged that ballots were not processed and counted which should have been, errors were made in canvassing returns, and a changed program led to errors in voting machines. (*Pini, supra*, 9 Cal.App.5th at p. 70.) All such alleged mistakes, errors, or misconduct were attributed to the county and its election officials. As discussed, Pini did not when filing the election contest accuse defendant Fenley of misconduct that changed the results of the election.

Fenley points out that section 16600 provides that the trial court shall "determine the contested election, and shall have all the powers necessary to the determination thereof." Section 16602 provides that the trial "court shall be governed by the rules of law and evidence governing the determination of questions of law and fact, so far as the same may be applicable." These statutes do not compel strict compliance with intervention procedure to add a real party in interest in an election contest. In *Coghlan v. Alpers* (1903) 140 Cal. 648, the California Supreme Court held that the trial court did not abuse its discretion in consolidating 15 cases by separate losing candidates for supervisor into one trial for the sake of efficiency. (*Id.* at p. 650.) A similar objective is served in allowing the county to appear as a real party in interest, thereby ensuring a more complete and efficient presentation of evidence and argument regarding the conduct of county election officials challenged by Pini. (See *Clark, supra*, 243 Cal.App.4th at

33

pp. 912-913 [winner of an election contest named as defendant and the county's registrar of voters named as real party in interest and represented by county counsel]; *Salazar, supra*, 190 Cal.App.3d at p. 957 [city and city clerk named as respondents and winning candidates named as real parties].)

We conclude that the trial court did not abuse its discretion in allowing Trinity County to appear in the litigation as a real party in interest.

*Fair Trial and Due Process*

In a section of the opening brief inexplicably rendered entirely in single-spaced text (in violation of Cal. Rules of Court, rule 8.204(b)(5)), Pini presents another numbered list of "improper acts and omissions," which Pini claims denied her a fair trial, including the trial court's: (1) denying discovery of election materials; (2) denying Fenley's deposition; (3) allowing Trinity County to participate in the litigation as a real party in interest; (4) denying access to election records pretrial and in the courtroom; (5) allowing White to remain in the courtroom when not testifying; (6) not allowing 30 witnesses present at the courthouse to testify to voter discrimination; (7) denying Pini costs from the first appeal; and (8) denying Pini's motion to reopen the case.

" 'A fair trial in a fair tribunal is a basic requirement of due process.' " (*Gordon v. Justice Court* (1974) 12 Cal.3d 323, 328, fn. 5, quoting *In re Murchison* (1955) 349 U.S. 133, 136 [99 L.Ed. 942]; *Nightlife Partners v. City of Beverly Hills* (2003) 108 Cal.App.4th 81, 90.) However, "[t]he constitutional right to due process does not prohibit the enactment of reasonable rules of procedure or restrictions on evidence. [Citations.]" (*San Bernardino Community Hospital v. Workers' Comp. Appeals Bd.* (1999) 74 Cal.App.4th 928, 936 (*San Bernardino Community Hospital*).) "[T]he paramount concern of the due process clause is *fairness.* [Citation.] There is nothing fundamentally inequitable in requiring a party to comply with established procedural rules which are designed to improve the overall fairness and efficiency of an adjudicatory procedure." (*Id.* at pp. 936-937.)

34

Not every ruling by a trial court that adversely affects a litigant's presentation at trial amounts to constitutional error. (*In re Marriage of Carlsson* (2008) 163 Cal.App.4th 281, 291.) A trial court "has the power to rule on the admissibility of evidence, exclude proffered evidence that is deemed to be irrelevant, prejudicial or cumulative and expedite proceedings which, in the court's view, are dragging on too long without significantly aiding the trier of fact." (*Ibid.*) It is only when the court abuses this discretion " 'in such manner as to prevent a full and fair opportunity to the parties to *present all competent, relevant, and material evidence* bearing upon any issue properly presented for determination' " that due process rights are implicated. (*Elkins v. Superior Court* (2007) 41 Cal.4th 1337, 1357.)

Other than to cite authority articulating some general principles regarding the limits of a trial court's discretion and the constitutional right to a fair trial, Pini does not elucidate how or why the trial court's rulings listed in this section denied her a fair trial or due process. As discussed, a list of claimed violations or errors does not constitute cognizable legal argument. Nonetheless, we address the particular rulings enumerated.

Pini moved to compel records sought by public records act requests for election records. The motion was filed on October 15, 2018, and heard on November 9, 2019. The trial court denied the motion, noting that the discovery cutoff was October 19, 2018. The court also observed that an election contest is intended to be an expeditious and summary proceeding,[13] and while "we all agree that isn't what's happening here," the court was unwilling to further delay the trial on discovery issues. The court commented that "the recurring issue is that the contestant consistently does not draw a nexus between the items sought and its relevance to the eventual outcome, in terms . . . of who the victor

---

[13] (See *Chatham v. Mansfield* (1905) 1 Cal.App. 298, 302 ["[a]n election contest is intended to be a summary proceeding"]; accord, *Benson v. Superior Court* (1963) 214 Cal.App.2d 551, 563.)

35

would be and how people have voted." Pini does not provide any argument or legal authority indicating why this ruling was an abuse of discretion, let alone an error of constitutional dimension. We find no basis in the record to come to that conclusion.

Next is the trial court's ruling denying Pini's request to depose Fenley. At a hearing on October 16, 2017, the court denied Pini's "request to conduct discovery as to Mr. Fenley. It's not relevant to the pending action." Pini's own testimony regarding a related action she filed against Trinity County and its board of supervisors supports the trial court's ruling. Pini acknowledged that she verified in writing that she did not allege any wrongdoing by Fenley and had only named him in her election contest statement to comply with the Elections Code.

Pini follows this contention by reiterating her claim that it was improper to permit the county to appear as a real party in interest, which we have rejected on the merits. For the same reason, we also reject the claim cast as a violation of the right to a fair trial and due process. The addition of "constitutional gloss" does not add anything to our analysis of the trial court's determination of this issue. (See *County of Glenn v. Foley* (2012) 212 Cal.App.4th 393, 398 (*County of Glen*).)

Pini's fourth issue repeats the claim we rejected regarding the trial court's denial of Pini's motion to compel election records. Pini adds that that the trial court ordered the court clerk to make the records available a "mere" half-hour before trial commenced. This argument is misleading. Pini's trial subpoenas called for the records to be produced on the first day of trial at 9:00 a.m. After checking with the clerk's office that the courtroom could be opened at 8:30 a.m., the trial judge requested that White and counsel be present at that time to pre-mark exhibits. Pini does not explain why this procedure was unreasonable, let alone a violation of due process. Pini adds the clerk did not provide access as directed by the court. Pini provides no citation to the record in support of this additional claim, which we accordingly disregard. (*Alki Partners, supra*, 4 Cal.App.5th at p. 589.)

36

Pini contends it was improper for the trial to allow White, "a hostile witness," to remain in the courtroom throughout the trial. The court granted a motion to exclude witnesses from the courtroom. The county thereafter requested that "under the circumstances in light of the allegations in this case that Miss White be permitted to stay throughout the trial." The court granted this request.

Characterizing White as "hostile" implies that the Trinity County elections office was Pini's adversary in the litigation. In an election contest, however, "[t]he inquiry must be as to whether or not the popular will in the selection of officers to administer the public affairs has been, in a given instance, or is about to be, defeated or thwarted by mistake happened or fraud concocted. It is, therefore, not an ordinary adversary proceeding, for, as against this high public interest concerned, there can be no recognized adversary." (*Minor v. Kidder* (1872) 43 Cal. 229, 237.)

Evidence Code section 777, subdivision (a), provides that the trial court "*may* exclude from the courtroom any witness not at the time under examination so that such witness cannot hear the testimony of other witnesses." (Italics added.) "[E]xclusion of witnesses lies entirely within the discretion of the trial court and . . . error cannot be predicated thereon without a clear abuse of discretion [citations]." (*People v. White* (1950) 100 Cal.App.2d 836, 838; see also *People v. Tully* (2012) 54 Cal.4th 952, 1004.) The allegations of Pini's election contest statement involve voter registration and processing and counting votes, functions performed and overseen by White on behalf of Trinity County. Under the circumstances it was not an abuse of discretion to allow White to remain in the courtroom throughout the trial. Since we reject this contention on the merits, we also reject it as a constitutional claim. (See *County of Glenn, supra*, 212 Cal.App.4th at p. 398.)

Pini contends that the trial court "[d]isallowed over 30 witnesses that were present at the courthouse to testify to voter discrimination." The citation Pini provides to the reporter's transcript involves the trial's court exclusion on the last day of trial of *three*

witnesses who were not on Pini's new witness list disclosed the previous day. That day Pini's counsel stated that 15 witnesses were present but only two had been on Pini's prior witness list. Pini's counsel also said that the new list included new witnesses, and there were "20 other" additional witnesses who were not specifically identified on the list. The court said it would not allow unidentified witnesses to testify but would allow witnesses who were identified or partially identified due to error.

This claim is less than clear because Pini has not included any witness list in the record. However, the record indicates that some number of proposed witnesses had not been identified on a witness list and were accordingly excluded. A trial court does not abuse its discretion in excluding testimony from a witness that a party did not identify. (*Reales Investment, LLC v. Johnson* (2020) 55 Cal.App.5th 463, 471; *Castaline v. City of Los Angeles* (1975) 47 Cal.App.3d 580, 591 [no abuse of discretion in excluding testimony of "surprise witness"].) Nor did the exclusion of unidentified witnesses violate Pini's due process rights. (*Reales, supra*, at pp. 473-474.) Due process does not entitle a litigant to present testimony where an opponent's ability to counter that testimony is undermined by the failure to disclose the witness. (*Ibid.*; *Peat, Marwick, Mitchell & Co. v. Superior Court* (1988) 200 Cal.App.3d 272, 290.)

Pini complains that the trial court denied her requests for costs incurred in her first appeal. We awarded the appellant costs on appeal in our opinion in *Pini*, issued on February 28, 2017. (*Pini, supra*, 9 Cal.App.5th at p. 77, citing Cal. Rules of Court, rule 8.278(a).) The remittitur, issued on May 2, 2017, also stated appellant was to recover costs. On June 2, 2017, Pini filed a memorandum of costs on appeal. On June 27, 2018, the trial court denied costs finding that Pini's memorandum was not served on opposing parties.

The costs form Pini utilized states that "[y]ou must file a proof of service for this document." California Rules of Court, rule 8.278(c)(1) provides that "[w]ithin 40 days after issuance of the remittitur, a party claiming costs awarded by a reviewing court must

38

*serve* and file in the superior court a verified memorandum of costs under rule 3.1700." (Italics added.) There is no proof of service of the cost memorandum in the record. Pini does not argue that the trial court incorrectly determined that cost memorandum was not served or that failure to serve was not a basis to deny costs. Nor did Pini seek relief from the failure to serve the cost memorandum under Code of Civil Procedure section 473. (*Ganey v. Doran* (1987) 191 Cal.App.3d 901, 910; *Soda v. Marriott* (1933) 130 Cal.App. 589, 592-593.) We reiterate that requiring Pini to comply with established procedural rules does not violate due process. (*San Bernardino Community Hospital, supra*, 74 Cal.App.4th at pp. 936-937.)[14]

The last item on Pini's list is the trial court's refusal to reopen the case to allow Giddings to testify. We rejected this claim on the merits and we reject it cast as a claim of constitutional error. There is no abuse of discretion or constitutional error in denying a belated request to present additional testimony of questionable significance that could have been obtained with reasonable diligence to present at trial.

Besides the acts enumerated, Pini asserts in passing that county counsel's law firm received public funds in violation of Government Code section 54964, subdivision (a). Pini argues "[t]he Equal Protection Clause of the Fourteenth Amendment was not upheld

---

[14] Fenley argues that Pini cannot claim costs incurred in a prior appeal because they are not part of the judgment currently on appeal. In *Dennis v. Overholtzer* (1961) 191 Cal.App.2d 791, this court held that costs awarded in a prior appeal could be allowed in a subsequent judgment in the same case, observing that costs are incidental to the judgment on the merits and do not change the substantial terms of the judgment. (*Id.* at pp. 797.) Thus, Pini was not precluded from seeking appellate costs, or appealing a denial of such costs, merely because they were incurred in a prior appeal. Fenley also cites section 16802: "Primarily each party is liable for the costs created by himself or herself to the officers and witnesses entitled thereto, which costs may be collected in the same manner as similar costs are collected in other cases." The record does not include an objection by Fenley to our award of costs in *Pini, supra*, 5 Cal.App.5th at page 77, or in the trial court, thereby waiving the issue. (*Oak Grove School Dist. v. City Title Ins. Co.* (1963) 217 Cal.App.2d 678, 698.)

in this case, where one party, Fenley, had access to unlimited public funds while the other, Pini, had to rely on private (and negligible) resources."

Government Code section 54964, subdivision (a), provides that "[a]n officer employee, or consultant of local agency may not expend or authorize the expenditure of any of the funds of the local agency to support or oppose the approval or rejection of a ballot measure, or the election or defeat of a candidate, by the voters."  The term "Expenditure" as used in the statute means "a payment of local agency funds that is used for communications that *expressly advocate* the approval or rejection of a clearly identified ballot measure, or the election or defeat of a clearly identified candidate, by the voters."  (Gov. Code, § 54964, subd. (b)(3), italics added.)  Thus, the statute addresses communications expressly advocating for the adoption of a ballot measure or the election of a candidate by the voters, i.e., campaign activity.  (*Vargas v. City of Salinas* (2009) 46 Cal.4th 1, 27.)  Pini does not cite, and we are not aware of, any reported decision prohibiting a local agency from paying legal expenses incurred by an official in connection with a postelection contest.

As far as Pini's assertion that the Equal Protection clause was "not upheld" because the county used public funds to pay legal expenses, while her resources were "negligible," we note that Pini does not claim to be indigent.  (See *Payne v. Superior Court* (1976) 17 Cal.3d 908, 919 [indigent prisoner seeking to defend a civil suit had a due process and equal protection right of access to courts abridged by denial of appointed counsel].)  The record shows that throughout both phases of the trial Pini was represented by two lawyers.  Unlike the defendant in *Payne*, Pini brought this action and was represented by counsel at all times relevant to this appeal.

*State and Federal Constitutional Rights*

Pini follows the list of trial court rulings that she claims denied her a fair trial with yet another numbered list of acts and omissions that Pini asserts violate her constitutional

40

rights.  While Pini references the right to equal protection, her main concern appears to again be denial of due process.

Pini contends her "rights to due process have been violated in several substantial ways":  (1) Fenley failed to reply to the election contest statement; (2) Fenley failed to file a trial brief; (3) Fenley failed to present a defense to the claims alleged in the election contest statement; (4) Fenley failed to reply to the first amended election contest statement; (5) the trial court allowed real party in interest Trinity County to oppose Pini's motions and county counsel to act as lead trial attorney; (6) the court allowed White to remain in the courtroom throughout the trial; (7) the court refused to enforce production of election records, data and communications under the California Public Records Act (Gov. Code, § 6250 et seq.); (8) the court denied the testimony of 30 witnesses due to the objections of Trinity County; (9) the court denied Pini and her expert witness access to electronic voting systems; (10) the trial court judge was biased; (11) the court denied Pini's motion to reopen to present additional testimony; (12) the court denied Pini's request to depose Fenley; and (13) election officials conspired to discriminate against Hmong voters via a scheme using provisional ballots.[15]

Pini lists 15 "offenses" but reviewing them we find only 13 issues, since one of the 15 simply references legal authority on access to public records and another one asserts without citing authority that "state and federal law provide for the preservation and access to election materials in the specific event of a challenge particularly for an election that included federal candidates."  In addition, we have already discussed Pini's due process claims regarding the trial court's allowing Trinity County to appear as a real

---

[15]  Only this last item appears to touch on equal protection.  (See *Vosburg v. County of Fresno* (2020) 54 Cal.App.5th 439, 455["The right to vote is also a fundamental right for purposes of the equal protection clause in the Fourteenth Amendment"]; *Jauregui v. City of Palmdale* (2014) 226 Cal.App.4th 781, 799-800.)

party in interest, allowing White to remain in the courtroom throughout the trial, denying testimony of witnesses not identified on a witness list, denying Pini's motion to reopen the case to allow Giddings to testify, and denying Pini's request to take Fenley's deposition. We also have discussed Pini's bias claim against the trial judge which we have determined warrants referral to the State Bar.

We turn to the remaining claims, which we count six in number. As with Pini's previous list of claimed violations of due process, Pini for the most part fails to provide cognizable legal argument supported by authority and citations to the record how her constitutional rights were violated.

Pini's first contention is that Fenley never filed an answer to the elections contest statement and thus lost "standing to file motions or mount a defense." This contention pertains to Pini's request for entry of a default. Pini filed a request for entry of default on the eve of trial, and counsel for Pini reiterated the request on the first day of trial, arguing "there has been no verified affidavit or answer that contest the allegations made by the contestant." The court responded: "Mr. Fenley has appeared in the proceeding for over two years and there has never been any objections, so the Court denies the request to enter a default."

An elections contest is a special proceeding in which a judgment by default cannot be rendered. "The Court must proceed to hear the proofs and allegations of the parties, and without regard to the allegations of the contestant or the default of the defendant." (*Dorsey v. Barry* (1864) 24 Cal. 449, 452; see also *Lord, supra*, 79 Cal. at p. 488.) In *Lay v. Parsons* (1894) 104 Cal. 661, the California Supreme Court explained that elections contest cases "are not to be regarded as of purely an adversary character; that the public has an interest in their proper determination, which will prevent their being disposed of otherwise than on their merits; and hence, that a default cannot be taken or dismissal had, which will preclude an examination into the merits of the controversy." (*Id.* at p. 663.)

42

Next Pini contends that Fenley "failed to file a trial brief while Contestant met her brief [*sic*] in a timely manner, twice." This contention is factually incorrect. On January 11, 2019, Fenley a trial brief on the issue of laches, as requested by the trial court. Fenley's trial brief began with the statement that "[o]n November 19, 2018, at [*sic*] the first day of trial in this case, this Court heard arguments on the positions raised in [Fenley's] trial brief, which the Court referred to as a motion to dismiss." Fenley's earlier trial brief is not in the record. However, the reporter's transcript for the proceedings on November 19, 2018, includes the trial court's comment that "the Court has received and reviewed the trial briefs and pretrial motions. And in essence [counsel for Fenley's brief] is a motion to dismiss." Since this contention is fully contradicted by the record, we need not consider its legal merit.

In a similar vein, Pini contends that Fenley "failed to reply and present a defense to deny Contestant's complaints in the elections contest." As discussed, Fenley was not required to file an answer to Pini's election contest statement in order to defend the case. (*Bass v. Leavitt* (1909) 11 Cal.App. 582, 585 [it is proper for the respondent to file an answer to an election contest statement but it is not required].) More significantly, this claim is unsupported by any citation to the record. Our review of the record discloses that, in addition to trial briefs, Fenley filed motions in limine, responded to discovery motions, joined in Trinity County's oral motion for judgment, and filed separate objections to Pini's supplemental opposition to the motion for judgment. Fenley's counsel attended every day of trial, argued motions in limine, moved an exhibit into evidence, and cross-examined Pini. We conclude this claim is frivolous.

Pini contends that Fenley "failed to reply to Contestant's First Amended Contest Statement thereby losing standing to [*sic*] any defense." On February 22, 2019, Pini filed a request to amend her election contest statement to conform to proof. On March 4, 2019, Pini filed an amended election contest statement. On April 2, 2019, the trial court denied Pini's request, citing statutes providing that an elections contest "is a summary

proceeding" and concluding that "filing of an Amended Contest statement more than 2 1/2 years after the original filing and after the Contestant rested at trial is not within the contemplated scope of the statutes." We conclude the contention that Fenley lacks standing because he failed to reply to an amended pleading that the court did not allow Pini to file is also frivolous.

Pini follows this issue with the argument that "[t]he court denied Contestant and her expert witness access to electronic election systems. County counsel stated that the memory cards were 'written over' and no longer useful violating" section 15209.[16]

On April 27, 2018, the trial court issued an order reopening discovery "for the limited purpose of Contestant Pini's physical inspection of all records and relevant hard drives and software." This was a second inspection, which the court authorized because of Pini's substitution of legal counsel. The court further ordered that "only contestant, her counsel and one expert can be present for the inspection."

However, at a hearing on May 30, 2018, the court addressed a May 25, 2018 letter brief from Pini's counsel, "specifically the last paragraph of Page 1." The letter is not in the record. However, the court noted the "last paragraph on Page 1, it requests -- you're requesting an expert to ascertain identification, preservation and investigation of all election media." The court asked Pini's counsel to address two questions: "What is the relevance of the discovery request, and what specifically does this mean, identification, preservation, [investigation] of the media?"

After argument by counsel for the parties, the court ruled: "[T]he request is denied without prejudice. If, during the trial, the relevance of this becomes clear, since

---

[16] Section 15209 provides: "Any magnetic or electronic storage medium used for ballot tabulation program and any electronic storage medium containing election results shall be kept in a secure location and shall be retained for six months following any local election and 22 months following any federal election or so long thereafter as any contest involving the vote at the local or federal election remains undetermined."

it's not a jury trial, it's a court trial, the Court can adjourn and continue the matter and allow . . . discovery to be reopened on this one limited issue. And even though it may not be burdensome to the county to permit it, and it's already been said there wouldn't be any financial burden to the county, the Court believes at this stage it's just a fishing expedition. And in light of the actual physical ballots that can be counted, and the contrast between the results of the physical count versus the system hasn't been disclosed, and the Court hasn't considered if there's ballots that have been improperly excluded, the Court does not believe that there is legal basis for the Court to order it at this time."

Following this ruling, Pini's counsel requested a protective order that White and the elections office not "destroy or tinker with results which we . . . choose to look at." The court suggested that counsel draft a protective order. The draft order is not in the record. Fenley and Trinity County provided written responses to the draft order.

At a hearing on the proposed protective order, the discussion focused on memory cards used in voting machines. Pini's counsel argued that the memory cards used in the June 2016 election should be preserved and not used. Counsel for Trinity County argued that the memory cards were reused for each election after the data on the cards is transferred to the state elections computer system. Counsel stated that the memory cards had been wiped and reused for three subsequent elections since the June 2016 election. The court stated that it would take the matter under submission and issue an order. There is no oral or written order in the record.[17]

---

[17] To the extent Pini claims the trial court erred in denying her request for a protective order, Pini did not provide us with a record or citation to the record indicating whether or how the court ruled on the motion for protective order, and has thereby forfeited consideration of that issue. (*Pinter-Brown v. Regents of University of California* (2020) 48 Cal.App.5th 55, 95, citing *Atempa v. Pedrazzani* (2018) 27 Cal.App.5th 809, 831; see also *In re S.C., supra*, 138 Cal.App.4th at pp. 406-407 ["When an appellant's brief makes

We find no abuse of discretion or denial of due process in the trial court's ruling denying Pini's request for inspection. Pini does not explain why the discovery already conducted was insufficient or what particular information she was denied. (*Millview County Water Dist. v. State Water Resources Control Bd.* (2014) 229 Cal.App.4th 879, 906.) The court left open the possibility of further discovery if its relevance became apparent in the course of the trial. Pini does not suggest that this occurred.

Pini also does not explain how she was prejudiced by any violation of section 15209 in reusing memory cards in voting machines. Counsel for Trinity County argued at the hearing on May 30, 2018, that no protective order was required because "[a]ccording to the -- statutes of the State of California and the elections office and the Secretary of State, there are requirements with regard to maintaining data regarding elections, which we have complied with. All this information is stored electronically. It's not disposed of. And although there are limitations on the length of time the documents have to be retained after an election, in this particular election, because of this lawsuit, everything's been retained." Specifically, counsel stated that election "results are . . . transferred to the election system, which is a computerized system." Pini does not argue that any relevant data was lost by reusing memory cards in voting machines.

Lastly, Pini claims that "[e]lections officials did conspire to discriminate against an entire class of voter with a scheme" to fail to process and preserve voter registration affidavits and an "artifice" to use provisional ballots with "no records of how many were printed, how many voted and how many destroyed, in order to control an entire vote . . . ." Once again, Pini provides no citations to the record supporting these factual statements and no argument supported by legal authority explaining how her rights to due process and equal protection were violated.

---

no reference to the pages of the record where a point can be found, an appellate court need not search through the record in an effort to discover the point purportedly made"].)

In a rambling discussion that follows, Pini focuses on White's testimony that she created provisional ballots on photocopy paper so that they could not be processed through the voting machine until the voter was determined to be eligible. We have already determined that trial court's findings were supported by substantial evidence that provisional ballots were not illegal and irregularities associated with paper provisional ballots were technical violations that did not alter the outcome of the election. Pini does not provide any additional facts, argument or authority to disturb that determination and does not establish a violation of any constitutional right.

## DISPOSITION

The judgment is affirmed. Fenley shall recover costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1), (2).) Upon issuance of the remittitur, the Clerk/Administrator of this court is directed to send a copy of this opinion to the State Bar of California.


                              /s/
                        RAYE, P. J.



We concur:



      /s/
BLEASE, J.



      /s/
ROBIE, J.


47